TEXACO INC., Plaintiff-Appellee,

v.

PENNZOIL COMPANY,
Defendant-Appellant,

State of Texas, Intervenor.

Nos. 883, 884, Dockets 86–7046, 86–7052.

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1986.

Decided Feb. 20, 1986.

**1136**

Arthur L. Liman, New York City and Laurence H. Tribe, Cambridge, Mass. (Mark A. Belnick, Gerard E. Harper, Brad S. Karp, Stephen M. Merkel, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, John L. Jeffers, Jr., G. Irvin Terrell, Baker & Botts, Houston, Tex., Paul M. Bator, Mayer, Brown & Platt, Chicago, Ill., of counsel), for defendant-appellant Pennzoil Co.

David Boies and Paul J. Curran, New York City (Thomas D. Barr, Max R. Shulman, Francis P. Barron, Stephen S. Madsen, William F. Duker, Stephen D. Poss, Robert B. Silver, Rosemary Q. Barry, Richard L. Crisona, Nicholas A. Gravante, Jr., Linda C. McClain, Dominic Surprenant, Cravath, Swaine & Moore, Milton J. Schubin, Randolph S. Sherman, Ira S. Sacks, David R. Garcia, J. Clark Kelso, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for plaintiff-appellee Texaco Inc.

Jim Mattox, Atty. Gen., State of Tex., Austin, Tex. (Mary F. Keller, Executive Asst., J. Patrick Wiseman, W. Robert Gray, Asst. Attys. Gen., of counsel), for intervenor State of Tex.

Amici briefs have been received from the following: State of Ala., State of Alaska, State of Cal., State of Del., State of Fla., State of Kan., State of Mont., NAACP, State of N.M., State of N.Y., U.S. Senator Alfonse M. D'Amato, Rep. Hamilton Fish, Jr. and 24 Other Members of U.S. Congress from New York, The Business Council of New York, State of Okl., Atty. Gen. of State of Okl., Hon. Jack Brooks and 12 Other Members of U.S. Congress from Texas, State of Wash., State of Wyo., Henry Fowler, W. Michael Blumenthal, G. William Miller and William E. Simon, former Secretaries of the U.S. Treasury, and The Committee of Concerned Employees and Retirees (Stockholders) of Texaco Inc.

Before LUMBARD, MANSFIELD and PIERCE, Circuit Judges.

MANSFIELD, Circuit Judge:

Pennzoil Company ("Pennzoil"), a Delaware corporation with its principal place of business in Texas, appeals an order of the Southern District of New York, 626 F.Supp. 250, Brieant, *Judge*, granting to Texaco Inc. ("Texaco"), a Delaware corporation based in New York, a preliminary injunction restraining Pennzoil from seeking to enforce a judgment entered on December 10, 1985, by the Texas state court for the 151st Judicial District in the sum of $11.12 billion (including punitive damages, pre-judgment interest and costs) in Pennzoil's favor against Texaco.[1] The Texas judgment, handed down after a four-and-one-half month jury trial, was based on the jury's findings with respect to special issues propounded by the court.

In substance the jury found that Texaco had knowingly and intentionally interfered with a pending agreement between Getty Oil Co. ("Getty") and Pennzoil, which was negotiated in New York, for the latter's acquisition of approximately 3/7ths of Getty's outstanding shares at $110.00 per share plus certain additional consideration and that Pennzoil was entitled to $7.53 billion compensatory damages and $3 billion punitive damages. The stock was eventually sold by Getty to Texaco at a higher price ($128 per share) than that found to have been agreed upon between Getty and Pennzoil.

The present action was commenced by Texaco's filing of its complaint in the Southern District of New York on December 10, 1985. The complaint set forth seven claims (described *infra* at p. 1139)

---

1. Upon the district judge's invitation the State of Texas intervened as a party pursuant to 28 U.S.C. § 2403(b) and has also appealed.

alleging that the Texas judgment and enforcement of it through use of Texas lien and supersedeas bond provisions (described *infra* at pp. 1138–39) would violate its rights under the Commerce, Supremacy, Full Faith and Credit, Due Process and Equal Protection Clauses of our federal Constitution, as well as under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rules promulgated by the S.E.C. under the latter Act.

We hold that the district court had jurisdiction over the Third and Sixth Claims of Texaco's Amended Complaint (due process and equal protection) in the present action and that the grant of preliminary injunctive relief based on them does not represent an abuse of judicial discretion since it is supported by undisputed facts that satisfy well-established standards for preliminary injunctive relief. However, all other claims asserted in Texaco's complaint must be dismissed for lack of subject matter jurisdiction since they seek appellate review on the merits of the Texas judgment in violation of 28 U.S.C. § 1257 as interpreted by the United States Supreme Court.[2] *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 286, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The injunctive relief issued by the district court on the Third and Sixth Claims of the Amended Complaint is affirmed. The case is remanded with directions to dismiss the First, Second, Fourth, Fifth and Seventh Claims.

The principal issues in the Texas case were whether Getty had entered into an agreement with Pennzoil, whether Texaco had according to the law of New York tortiously interfered with that contract, and, if so, what damages were suffered by Pennzoil as a result of Texaco's conduct. Following the jury's special findings in Pennzoil's favor on these issues the Texas trial judge, Hon. Solomon Casseb, denied Texaco's motion for judgment n.o.v., which was sought on various grounds, including all of those alleged in the present federal action except those alleged in the Third and Sixth Claims. On December 10, 1985, Judge Casseb entered judgment in favor of Pennzoil against Texaco in the sum of $7.53 billion compensatory damages, $3 billion punitive damages and $624,753,662 prejudgment interest to December 9, 1985, from which $33,777,551.17 was subtracted according to a stipulation filed by Pennzoil. The judgment totalled $11,120,976,110.83 and provided that post-judgment interest would be recoverable by Pennzoil at the rate of 10% per annum until the judgment was paid. Texaco's motion for a new trial remains pending before Judge Casseb.

With the consent of the parties, Par. 7 of the judgment, in order to preserve the status quo as long as the trial court had jurisdiction of the case, prohibited Pennzoil, during the pendency of the proceeding before the trial judge, from seeking to enforce the judgment and barred Texaco from encumbering its assets except "in the routine and ordinary course of business". The purpose of Par. 7 was to avoid the possible collapse and liquidation or bankruptcy of Texaco that might be precipitated by the sudden financial crisis it faced as a result of the astronomical amount awarded against it. However, this relief would be short-lived since it would expire when the Texas trial court lost jurisdiction over the case, which could occur as early as 30 days after the trial judge's denial of Texaco's motion for a new trial and at the latest on March 25, 1986.[3] Thus, Texaco could antic-

**2.** 28 U.S.C. § 1257 provides in pertinent part:
"**§ 1257. State courts; appeal; certiorari**
"Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:
\* \* \* \* \* \*

"(2) By appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity."

**3.** If the Texas trial court denies Texaco's motion for a new trial, it will, under Tex.R.Civ.P. 329b,

ipate that if Judge Casseb denied the motion on the same day it was filed, January 9, 1986 (as he did with respect to the motion for judgment n.o.v.), Par. 7 would expire by February 10, 1986.

Upon the expiration of Par. 7 of the Texas judgment, Texaco would, absent injunctive relief, again face a financial crisis of staggering proportions, which could not under Texas law be avoided without Pennzoil's consent. Rule 364 of the Texas Rules of Civil Procedure requires Texaco, in order to stay execution of the judgment against it pending its appeal, to post a supersedeas bond, payable to Pennzoil, "in at least the amount of judgment, interest and costs,"[4] or more than $12 billion since interest accumulates at the rate of approximately $3 million per day. In addition, Tex.Prop.Code Ann. §§ 52.001 *et seq.* (Vernon 1983), provides that an abstract of judgment presented by the judgment creditor (Pennzoil), when properly recorded and indexed, constitutes a lien "on the property of the defendant located in the county in which the abstract was recorded and indexed ...". *Id.* § 52.001. Texaco's real property in the State of Texas is estimated to be worth $5 billion.

Needless to say, Texaco could not possibly meet the mandatory bond requirement. It is estimated that the world-wide surety bond capacity ranges from $1 billion to $1.5 billion under the best possible circumstances. In addition, full collateralization would be required for a bond of such huge proportions. Texaco does not have sufficient liquid or immediately-liquidatable assets to post $12 billion in cash or cash equivalents and still retain sufficient liquid assets to operate its business. Moreover, it would be unable, because of the terms of its unsubordinated debt securities, to borrow $12 billion by mortgaging or pledging its assets. A lien of such proportions would seriously impair its ability to carry on its business with the result that it would probably be forced into bankruptcy or liquidation.

Under Texas law, relief from the harsh strictures of Rule 364 is not immediately available to Texaco. The Rule's terms have repeatedly been declared by Texas courts to be mandatory, requiring that the supersedeas bond be in at least the amount of the judgment, interest and costs and prohibiting the requirement from being partially superseded. *Mudd v. Mudd,* 665 S.W.2d 128, 130 (Tex.Civ.App.1983); *Fortune v. McElhenney,* 645 S.W.2d 934, 935 (Tex.Civ.App.1983); *Kennesaw Life & Accident Ins. Co. v. Streetman,* 644 S.W.2d 915, 917 (Tex.Civ.App.1983); *Haney Elec.*

---

retain jurisdiction over the case for, at most, 105 days after December 10, 1985 (the date the trial court signed the judgment). Its jurisdiction would therefore terminate on March 25, 1986. Under Tex.R.Civ.P. 329b(a) a party may move for a new trial within 30 days after the judgment complained of has been signed. Texaco complied with this procedure. Under Tex.R. Civ.P. 329b(c) the trial judge then has 75 days from the day he signed the judgment in which to rule on the motion. If he does not rule within that period, i.e., by February 23, 1986, the motion will be denied by operation of law. Regardless of the means by which the motion is denied, the judge retains jurisdiction over the case for 30 days after its denial. Tex.R.Civ.P. 329b(e). After the 30–day period, however, the trial court's plenary jurisdiction ceases. Tex.R. Civ.P. 329b(f). Accordingly if Judge Casseb denies the motion before February 23, he will retain jurisdiction over the case for 30 days thereafter. If he does not rule on the motion, Texas law will consider it to have been denied on February 23. The court will then retain

jurisdiction for 30 more days, i.e., until March 25.

4. Tex.R.Civ.P. 364 provides in part:

"**Rule 364. Supersedeas Bond or Deposit**
   "**(a) May Suspend Execution.** Unless otherwise provided by law or these rules, an appellant may suspend the execution of the judgment by filing a good and sufficient bond to be approved by the clerk, or making the deposit provided by Rule 14c, payable to the appellee in the amount provided below, conditioned that the appellant shall prosecute his appeal or writ of error with effect and, in case the judgment of the Supreme Court or Court of Appeals shall be against him, he shall perform its judgment, sentence or decree and pay all such damages as said court may award against him.
   "**(b) Money Judgment.** When the judgment awards recover of a sum of money, the amount of the bond or deposit shall be at least the amount of the judgment, interest, and costs."

*Co. v. Hurst,* 608 S.W.2d 355, 356 (Tex.Civ. App.1980); *Cooper v. Bowser,* 583 S.W.2d 805, 807 (Tex.Civ.App.1979); *Schrader v. Garcia,* 512 S.W.2d 830, 831 (Tex.Civ.App. 1974). This interpretation has been adopted by the Texas Subcommittee on Interpretation of Rules, 4 Tex.Civ.Code Ann., pp. 159–60 (Vernon 1985). Although Texaco could mount an attack in the Texas courts on the Rule, by motion and mandamus, on the ground that it is unconstitutional as applied in this case, the likelihood of obtaining a definitive constitutional ruling in the short period of time available to it appears extremely slim, at least without full cooperation on the part of Pennzoil. In the meantime Pennzoil, upon expiration of Par. 7 of the judgment, would have the right to execute its judgment, rendering even a favorable Texas court constitutional ruling "too little, too late".

Immediately following entry of the Texas judgment on December 10, 1985, Texaco, because of uncertainties regarding the meaning and effect of Par. 7 and the knowledge that it would shortly expire when the trial court lost jurisdiction, faced a serious crisis. Its bonds were downgraded and its credit lines shrank. Unsecured borrowing became unavailable and even secured financing uncertain. Suppliers, joint venturers, and purchasers of Texaco assets shied away from dealing with it, in part because many of those dealings would of necessity involve commitments beyond March 25, 1986, the last date when Par. 7 would be effective. An effort by Texaco on December 13, 1985, to obtain a hearing from the Texas trial court to consider modification of Par. 7 failed when Pennzoil would not agree to meet on dates specified by the court (Dec. 16, 17 or 18) and no alternative dates were made available.

On December 17, 1985, Texaco moved by order to show cause in the Southern District of New York, where Texaco has its principal place of business and personal jurisdiction over Pennzoil could be obtained, for a temporary restraining order

and preliminary injunction against Pennzoil's taking any action to enforce the Texas judgment. The Amended Complaint alleged (1) that the Texas judgment excessively burdened interstate commerce in violation of the Commerce Clause and frustrated the purposes of the Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)(f), by deterring competitive tender offers after a target company (in this case Getty) and a given bidder (Pennzoil) had conducted negotiations (First and Second Claims [5]); (2) that the Texas lien and supersedeas bond provisions, by preventing Texaco from effectively prosecuting appeals to the Texas Court of Civil Appeals, the Texas Supreme Court, and eventually to the United States Supreme Court under 28 U.S.C. § 1257(2), were void under the Supremacy, Due Process and Equal Protection Clauses of the United States Constitution (Third and Sixth Claims); (3) that the Texas judgment permitted Pennzoil to engage in unlawful conduct in violation of the Securities Exchange Act, 15 U.S.C. §§ 78j, 78m, 78n and Rule 10b–13 thereunder, 17 C.F.R. § 240.10b–13, namely, the purchase of Getty stock other than pursuant to Pennzoil's outstanding tender offer (Fourth Claim); (4) that the judgment violated the Full Faith and Credit Clause by disregarding the substantive law of New York, which the parties agreed governed (Fifth Claim); and (5) that the judgment was the product of fundamental unfairness in violation of the Due Process Clause (Seventh Claim).

Pending a hearing on Texaco's motion, Judge Brieant on December 17, 1985, issued a temporary restraining order. On December 20, 1985, Pennzoil cross-moved for dissolution of the restraining order and dismissal of the complaint for lack of jurisdiction and failure to state a claim. On the same date Pennzoil tendered to Texaco for filing in the Texas action a "stipulation" under which the Texas trial judge's power to issue a stay in that proceeding would be governed by the same supersedeas bond provisions as those governing federal ac-

---

**5.** Although Texaco labels each claim as a "cause of action", we prefer to use the term "claim", in accordance with the Federal Rules of Civil Procedure. *See, e.g.,* Fed.R.Civ.P. 8.

tions under Fed.R.Civ.P. 62. The offer, which was renewed upon argument of this appeal, has not been accepted by the Texas trial judge or by Texaco.

Both sides having waived the taking of oral testimony, the district court on January 10, 1986, filed its findings and conclusions in an opinion granting Texaco's application for preliminary relief and denying Pennzoil's cross-motion. The district court found that absent injunctive relief Texaco would, pending appeal from the Texas judgment, suffer irreparable injury from enforcement of the Texas supersedeas bond and lien provisions since it would be unable to post a bond in the sum of approximately $12 billion required by Tex.R.Civ.P. 364(b) or continue to conduct business operations while subject to liens under Tex. Prop.Code Ann. §§ 52.001 *et seq.* (Vernon 1983), with the result that it would probably be forced into bankruptcy or liquidation. The result would be catastrophic for thousands of Texaco employees, stockholders and suppliers located throughout the United States and world-wide and would threaten serious harm to the national economy and the public.

The district court next concluded that Texaco's appeal of the Texas judgment stood a substantial likelihood of success, at least in reducing the award of $11.12 billion damages. It reasoned that the impropriety of awarding punitive damages would be "quite obvious" to a Texas reviewing court and that the award had a "negative impact" on the federal policy expressed in the Securities Exchange Act of insuring that stockholders (in this case of Getty) derive the benefit of the best tender offer price. Using market prices of Getty stock as an indicator, the district court reasoned that, assuming the validity of the Texas jury's finding of tortious interference with the Getty-Pennzoil contract, the compensatory damages to Pennzoil "should in no event exceed $800 Million" if Pennzoil's bargain included the ultimate opportunity to control Getty.

Turning to the claims asserted by Texaco in the present federal suit, the district

court, after using a balancing of interests test derived from *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), concluded that Texaco's claim that the Texas bonding and lien provisions violated its Due Process and Equal Protection rights had a clear probability of success. The district court further held, on the basis of the Supreme Court's recent decision in *Marrese v. American Academy of Orthopaedic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), that enforcement of Texaco's federal securities law claims would not be precluded by the Texas judgment and that since federal courts had exclusive jurisdiction over them, 15 U.S.C. § 78aa, they would survive regardless of the ultimate outcome of the Texas suit. In so holding, the court cited the Supreme Court's decision in *Rooker, supra,* but did not discuss its applicability or that of 28 U.S.C. § 1257 to any of Texaco's claims in the present federal action.

The district court also refused Pennzoil's request that the court deny injunctive relief on grounds of federalism and comity. The federal Anti-Injunction Statute, 28 U.S.C. § 2283, was held inapplicable for the reason that actions under the Civil Rights Act, 42 U.S.C. § 1983, such as the present one, are expressly excepted from its application. *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). On the question of whether the present complaint stated a valid claim for relief under 42 U.S.C. § 1983, the district court followed the Fifth Circuit's decision in *Henry v. First National Bank of Clarksdale,* 595 F.2d 291 (5th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), in which that court in a § 1983 action upheld a preliminary injunction against private enforcement of a state court tort judgment pending appeal on the ground, among others, that application of a state supersedeas bond requirement would violate the plaintiff's federal constitutional rights.

Abstention under the principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 699 (1971), was denied on the ground that no impairment of a vital

state interest was shown. The court reasoned that an injunction would not adversely affect the operation of the Texas judicial system but, on the contrary, would facilitate its proper functioning by permitting Texaco's appeal to be heard and decided. Abstention under the principle of *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), was denied on the ground that, since the Texas bond and lien provisions were clear and mandatory, the constitutional issues could not be avoided by a state court interpretation of them.

In order to protect Pennzoil against Texaco's transferring or encumbering assets that would otherwise be available to Pennzoil if an appeal of the Texas judgment should end in Pennzoil's favor, the district court's January 16, 1986, order required Texaco as a condition of injunctive relief to post security in the sum of $1 billion subject to the proviso that additional security might be required after further hearing. The $1 billion figure was arrived at on the basis of the district court's determination that, at most, Pennzoil's compensatory damages in the Texas action should amount to $800 million, to which the court added $200 million for interest, costs and attorney's fees. On February 5, 1986, Texaco posted security in the sum of $1 billion.

## DISCUSSION

### The Existence of Federal Jurisdiction

The threshold questions are (1) whether federal jurisdiction exists that would permit a federal court to rule on Texaco's constitutional and federal law claims, and, if so, (2) whether the district court should, in the interests of comity and federalism, have abstained from exercising that jurisdiction in order to permit Texas courts to rule on those claims.

Pennzoil, relying on the Supreme Court's decisions in *District of Columbia Court of Appeals v. Feldman, supra, Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, supra,* and *Rooker v. Fidelity Trust Co., supra,* argues that the only courts empowered to entertain claims of constitutional error in a Texas state court judgment are the Texas appellate courts and the Supreme Court of the United States. Texas law guarantees a right to review by its appellate courts of lower state court decisions. *Texas State Constitution,* Art. I, §§ 13 and 19; *Stroud v. Ward,* 36 S.W.2d 590, 591 (Tex.Civ.App. 1931). Title 28 U.S.C. § 1257(2), in turn, grants to the United States Supreme Court appellate review of state court judgments. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 605, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975); *Cohen v. California,* 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284 (1971).

■ In *Rooker* the Supreme Court, in refusing to permit a losing state court litigant to invoke federal jurisdiction to attack a state court judgment on the ground that it had unconstitutionally misapplied state law, held that an appeal through the state courts to the Supreme Court constituted the exclusive procedure by which the judgment might be reviewed for constitutional error and that under the predecessor of § 1257 (Judicial Code, § 237, as amended September 6, 1916, c. 448, § 2, 39 Stat. 726),

> "If the constitutional questions stated in the bill actually arose in the cause, it was the province and duty of the state courts to decide them; and their decision, whether right or wrong, was an exercise of jurisdiction. If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding.... Under the legislation of Congress, no court of the United States other than this Court could entertain a proceeding to reverse or modify the judgment for errors of that character.... To do so would be an exercise of appellate jurisdiction." *Rooker, supra,* 263 U.S. at 415–16, 44 S.Ct. at 150.

The *Rooker* doctrine has been reaffirmed by the Supreme Court. In *Atlantic Coast*

*Line R. Co., supra,* 398 U.S. at 296, 90 S.Ct. at 1748, the Court stated:

"Again, lower federal courts possess no power whatever to sit in direct review of state court decisions. If [the party seeking the injunction] was adversely affected by the state court's decision, it was free to seek vindication of its federal right in the [state] appellate courts and ultimately, if necessary, in this Court."

In *Feldman, supra,* 460 U.S. at 476, 103 S.Ct. at 1311, the Court once again recognized the viability of *Rooker,* stating:

"The District of Columbia Circuit properly acknowledged that the United States District Court is without authority to review final determinations of the District of Columbia Court of Appeals in judicial proceedings. Review of such determinations can be obtained only in this Court. See 28 U.S.C. § 1257."

In short, an inferior federal court established by Congress pursuant to Art. III, § 1, of the Constitution may not act as an appellate tribunal for the purpose of overruling a state court judgment, even though the judgment may rest on an erroneous resolution of constitutional or federal law issues. The exclusive procedure for federal review is that specified by 28 U.S.C. § 1257.[6]

The rationale behind the *Rooker-Feldman* principle is clear and sound. In this nation we have two "essentially separate legal systems." *Atlantic Coast Line R. Co., supra,* 398 U.S. at 286, 90 S.Ct. at 1743. "[T]his dual system could not function if state and federal courts were free to fight each other for control of a particular case. Thus, in order to make the dual system work and 'to prevent needless friction between state and federal courts,' *Oklahoma Packing Co. v. Gas Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940), it was necessary to work out lines of demarcation between the two systems." *Id.*

Texaco contends that the *Rooker-Feldman* doctrine does not apply to collateral federal attacks on state judgments that have not attained appellate finality. We disagree and know of no decision so holding. Indeed, courts, including the Supreme Court, have not hesitated to apply the *Rooker-Feldman* doctrine to judgments which Texaco would label as "non-final". *Atlantic Coast Line R. Co., supra,* 398 U.S. at 296, 90 S.Ct. at 1748 (remedy for party adversely affected by lower state court judgment was to appeal to the state appellate courts, not to seek a federal injunction). *See also Thomas v. Kadish,* 748 F.2d 276, 282 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *Community Action Group v. City of Columbus,* 473 F.2d 966, 973 (5th Cir.1973); *Pilkinton v. Pilkinton,* 389 F.2d 32, 33 (8th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2057, 20 L.Ed.2d 1364 (1968).

Although the state judgments in *Rooker* and *Feldman* had survived appeal in the state court system, that fact was not advanced by the Supreme Court as a basis for, or as a condition to, its decisions. Rather the doctrine stems from recognition that (1) state courts are just as obligated and competent as federal courts to decide federal constitutional questions, *Moore v. Sims,* 442 U.S. 415, 430, 99 S.Ct. 2371, 2381, 60 L.Ed.2d 994 (1979); *Huffman, supra,* 420 U.S. at 610–11, 95 S.Ct. at 1211–12, (2) a path is available through the state appellate system to the Supreme Court, and that (3) waste of judicial resources and unnecessary friction between state and federal courts might ensue if a federal district court intervened to overrule a state court decision. *Atlantic Coast Line R. Co., supra,* 398 U.S. at 286, 90 S.Ct. at 1743. Allowing lower federal courts to review the judgments of state lower courts is as intrusive and as likely to breed antagonism between state and federal systems as allowing federal court review of the judgments

---

6. The habeas corpus jurisdiction of the lower federal courts is a constitutionally authorized exception to the principle of *Rooker-Feldman.* *See Sumner v. Mata,* 449 U.S. 539, 543–44, 101 S.Ct. 764, 767, 66 L.Ed.2d 722 (1981) ("even a single federal judge may overturn the judgment of the highest court of a State" in adjudicating a petition for habeas corpus relief).

of the states' highest courts. Indeed, if *Rooker-Feldman* only barred federal review of judgments which had been fully appealed through the state system, it would foster federal/state rivalry by creating incentives for disappointed state court appellants to forum-shop, jumping over to federal courts instead of appealing their cases to the states' highest tribunals. Once a litigant has received an adverse adjudication on a constitutional issue from the state court, the state adjudication is just as final for the purpose of applying the *Rooker-Feldman* doctrine as it would be for purposes of appeal.

Applying the foregoing principles, we are satisfied that the *Rooker-Feldman* doctrine was clearly violated by much of the district court's decision. Many of the judge's conclusions with respect to the merits of the Texas action, despite his lip-service disclaimer, constitute what amounts to an impermissible appellate review of issues that have already been adjudicated by the Texas trial court. These include his statements to the effect (1) that an award of punitive damages in the Texas action was improper, which a "reviewing court in Tex-as will find ... quite obvious," (2) that the $3 billion punitive damage award violates the policy expressed in federal securities laws, over which the federal court has exclusive jurisdiction, (3) that the Texas award of $7.53 billion was "absurd", and (4) that the compensatory damage award in the Texas action "should in no event exceed $800 Million". The proper fora for appellate review of these matters are the Texas appellate courts and eventually the Supreme Court of the United States. Moreover, the district court violated the *Rooker-Feldman* doctrine in holding that it had jurisdiction over all constitutional and federal statutory claims asserted by Texaco and that it would retain jurisdiction of them pending appeal through the Texas courts. Each of Texaco's constitutional and federal claims except those stated by it in its Third and Sixth Claims were raised by it as defenses in the Texas lawsuit and adjudicated against it.[7] The reviewability of these claims by the Texas appellate courts and ultimately by the Supreme Court pursuant to 28 U.S.C. § 1257 precludes an inferior federal court from exercising jurisdiction over them.[8]

---

7. Texaco raised its due process challenges to the trial itself in its motion to recuse Judge Farris, the Judge who presided over three-fourths of the case, and in its motion for a mistrial. It raised each of its other federal claims, except the due process and equal protection challenges to the Texas bond and lien provisions, in its memorandum in support of its motion for judgment notwithstanding the verdict. That document's Table of Contents reads:

"IV. EVEN IF PENNZOIL DID ENTER INTO A CONTRACT, IT WAS VOID AND UNENFORCEABLE; IT CANNOT, THEREFORE, BE USED AS A PREDICATE FOR A TORTIOUS INTERFERENCE CLAIM
A. THE ALLEGED CONTRACT WOULD HAVE VIOLATED SEC RULE 10b–13

\* \* \* \* \* \*

"IX. TEXACO IS ENTITLED TO JUDGMENT AS A MATTER OF FEDERAL CONSTITUTIONAL LAW
A. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE COMMERCE CLAUSE
B. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE SUPREMACY CLAUSE

C. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE FULL FAITH AND CREDIT CLAUSE
D. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE EQUAL PROTECTION CLAUSE
E. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE TAKINGS CLAUSE
F. ENTRY OF JUDGMENT AGAINST TEXACO WOULD VIOLATE THE DUE PROCESS CLAUSE"

8. The district court held that Texaco's claims under the Securities and Exchange Act of 1934 are not barred by *res judicata* because they are matters of exclusive federal jurisdiction. 15 U.S.C. § 78aa. The court relied on *Marrese v. American Academy of Orthopaedic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 874 (1985), for the proposition that a statutory grant of exclusive jurisdiction may create an exception to the general rule that decisions of state courts be accorded full faith and credit by federal courts. 28 U.S.C. § 1738. The court concluded that 15 U.S.C. § 78aa is such an exception and that the Texas court's rejection of Texaco's defenses based on federal securities laws were therefore not binding on a federal court. This was error.

■ Texaco's Third and Sixth Claims stand on a different footing from its other asserted grounds of relief—they were not presented to the state trial court. Although a state court judgment has claim-preclusive effect in federal court, *Migra v. Warren City School Dist.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), Pennzoil does not contend that that rule bars Texaco's claims here. Rather, Pennzoil contends that Texaco's claims are barred because *Rooker-Feldman* should be read broadly to preclude federal review of issues which a party could have raised in the state court proceeding, but chose to withhold from the state court. We disagree.

Aside from the absence of any support for Pennzoil's theory in any decision applying *Rooker-Feldman,* the theory would read 28 U.S.C. § 1257 to severely impair, perhaps negate, a litigant's right to gain equitable or other relief under 42 U.S.C. § 1983, *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), since most claims under § 1983, especially requests to enjoin ongoing state proceedings, could be raised in a related state proceeding. To relegate the § 1983 claimant in such cases to the state court would ignore Congress' purpose in adopting that statute. Section 1983 was intended "to provide dual or concurrent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief." *Patsy v. Florida Board of Regents,* 457 U.S. 496, 506, 102 S.Ct. 2557, 2563, 73 L.Ed.2d 172 (1982). *See also Allen v. McCurry, supra,* 449 U.S. at 99, 101 S.Ct. at 417. Accordingly, it is settled law that a § 1983 litigant need not first seek to vindicate his federal claims in state court before turning to a federal court for relief. *Patsy, supra; Board of Regents v. Tomanino,*

446 U.S. 478, 491, 100 S.Ct. 1790, 1798, 64 L.Ed.2d 440 (1980); *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). Indeed, the Court has recognized, in the context of criminal proceedings, that a litigant who is not collaterally estopped from raising a § 1983 claim, is not precluded from raising the same claim simply because he had an opportunity to raise it in an earlier state proceeding. *Haring v. Prosise,* 462 U.S. 306, 318–23, 103 S.Ct. 2368, 2375–78, 76 L.Ed.2d 595 (1983). Application of these principles is appropriate here because Texaco did not choose the Texas state court for resolution of the claims between the parties but was summoned into that court by Pennzoil. Texaco was not, therefore, engaged in forum-shopping when it sought relief under § 1983 in the Southern District of New York.

In accordance with the foregoing, we hold that the district court is barred by the *Rooker-Feldman* doctrine from exercising jurisdiction over the First, Second, Fourth, Fifth and Seventh Claims of Texaco's complaint and that they must be dismissed for lack of subject matter jurisdiction. *Rooker,* however, does not bar a federal court from exercising jurisdiction over the Third and Sixth Claims, which allege that the Texas automatic and mandatory lien and supersedeas bond provisions deny Texaco due process and equal protection as applied. Those claims have never been presented to or adjudicated by a state court. Nor are they "inextricably intertwined" with the barred claims. *Feldman, supra,* 460 U.S. at 482–83 n. 16, 103 S.Ct. at 1315–16 n. 16. Aside from the fact that our adjudication of the Third and Sixth Claims is not a collateral attack on the merits of the Texas judgment, Texaco, which did not choose the Texas state court forum, does not have a fair opportunity to

In *Murphy v. Gallagher,* 761 F.2d 878 (2d Cir.1985), we held that 15 U.S.C. § 78aa does not create an exception to the general requirement of full faith and credit. Since federal law does not bar state courts from exercising jurisdiction over defenses based on the Securities and Exchange Act of 1934, *see, e.g., Will v. Calvert Fire Ins.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978); *Weiner v. Shearson, Hammill & Co.,* 521 F.2d 817, 822 (9th Cir.1975); *Shareholders Management v. Gregory,* 449 F.2d 326, 327 (9th Cir.1971); *Aetna State Bank v. Altheimer,* 430 F.2d 750, 754 (7th Cir.1970), state court determinations relating to those issues are binding on subsequent federal court proceedings to the extent required by 28 U.S.C. § 1738.

seek and obtain a timely final resolution of those claims from the Texas courts and the Supreme Court before it will suffer irreparable harm because of the Texas lien and bonding provisions. See pp. 1152–53, *infra. Wood v. Orange County*, 715 F.2d 1543, 1547 (11th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). Our decision, therefore, does not displace any state court adjudication or offend basic principles of comity and federalism.

*Whether the Complaint States a § 1983 Claim, Including State Action*

■ The next question is whether the Third and Sixth Claims, as illuminated by the affidavits of both sides with respect to the need for preliminary relief, state the essential elements of an action under § 1983. That statute was intended to "interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Patsy, supra*, 457 U.S. at 503, 102 S.Ct. at 2561 (quoting *Mitchum, supra*, 407 U.S. at 242, 92 S.Ct. at 2162). In order to maintain a § 1983 claim, however, a litigant must allege and show deprivation (1) of a right "secured by the Constitution and laws of the United States", (2) by a defendant acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

■ The first element of a § 1983 action—threatened deprivation of a constitutional right—is adequately alleged in the complaint and supported by the parties' affidavits. The undisputed facts indicate that the automatic enforcement of the Texas lien and bond requirements against Texaco's property to the extent of $12 billion lacks any rational basis, since it would destroy Texaco and render its right to appeal in Texas an exercise in futility. This would at least amount to a deprivation of its property in violation of its right to due process under the Constitution. *Evitts v.*

*Lucey*, ⸺ U.S. ⸺, 105 S.Ct. 830, 840, 83 L.Ed.2d 821 (1985).[9]

The presence of the second essential element of a § 1983 action is more difficult to resolve. The Supreme Court has enunciated a two-step test for determining whether conduct resulting in the deprivation of a federal right is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

"First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

Texaco has satisfied the first prong of this test since Texas state law provides for enforcement of the judgment unless Texaco posts a supersedeas bond in the full amount of the judgment. Tex.R.Civ.P. 364(b), *supra.* Pennzoil contends, however, that it cannot fairly be termed a "state actor" and that the suit therefore fails to meet the second prong of the test. Resolution of this issue calls for a factual inquiry into the relationship between Pennzoil and the State of Texas that would result from Pennzoil's enforcement of the judgment. *See Lugar, supra*, 457 U.S. at 939, 102 S.Ct. at 2755 (citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)).

To enforce the judgment, Pennzoil would have to act jointly with state agents by calling on state officials to attach and seize Texaco's assets. A judgment creditor must first obtain a writ of execution, which is "a process of the court from which it is issued." Tex.R.Civ.P. 622. The writ is "directed to any sheriff or any constable

---

**9.** We discuss Texaco's due process claim more fully *infra* at 1153–1154.

within the State of Texas" and must be signed by the clerk or justice and bear the seal of the court. Tex.R.Civ.P. 629. Furthermore, the writ "shall require the officer to execute according to its terms." *Id.* Finally, when, as here, the judgment requires payment of money, the writ "must require the officer to satisfy the judgment and costs out of the property of the judgment debtor subject to execution by law." Tex.R.Civ.P. 630. When the sheriff or constable receives the writ, Texas law commands that "he shall proceed without delay to levy the same upon the property of the defendant". Tex.R.Civ.P. 637. Property levied upon pursuant to the writ of execution may ultimately be seized by the officer and liquidated to satisfy the judgment. Tex.R.Civ.P. 646a, 649.

In addition, Texas law authorizes the placement of judgment liens upon Texaco's property in the state immediately upon entry of judgment. Tex.Prop.Code Ann. § 52.001. Such liens are acquired by requesting state officials to undertake a series of acts. Pennzoil must obtain a certified abstract of the judgment from the clerk of the court which rendered judgment. *Id.* § 52.002. The abstract must contain certain information required by law. *Id.* § 52.003. The county clerk must then record the abstract in the county judgment record and enter it in the index to the record. *Id.* § 52.004.

Enforcement of the state court judgment therefore necessarily involves a panoply of activities undertaken together by Pennzoil and state officials, which constitutes joint action for the purposes of § 1983. In *Lugar v. Edmondson Oil Co.* the Supreme Court concluded that a private party who invoked Virginia's prejudgment attachment procedure acted jointly with the state. *Lugar, supra,* 457 U.S. at 942, 102 S.Ct. at 2756. The Virginia prejudgment attachment procedure, like the Texas procedure at issue here, provided that a private party could obtain a writ from the clerk of the state court and have the writ executed by a county sheriff. *Id.* at 924–25, 102 S.Ct. at 2747. Under the Virginia law, the sheriff was only empowered to attach the proper-

ty, while its owner retained possession. The Texas procedure, however, goes further and permits seizure by a Texas sheriff of attached property. We conclude, as the Supreme Court did in *Lugar,* that the "private use of the challenged state procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment" and § 1983. *Id.* at 933, 102 S.Ct. at 2751.

A different result is not compelled by the fact that *Lugar* involved a prejudgment attachment whereas the attachment here would be pursuant to a court judgment. The presence of a court judgment does not alter the fact that Texas state officials execute the judgment only at Pennzoil's behest. Pennzoil cannot be divorced from that execution procedure merely because a court authorized execution of the judgment. Indeed, to so hold would preclude the victim from obtaining relief against the party who must act jointly with the state official to unleash the unconstitutional state government action. To limit the *Lugar* rationale to prejudgment attachments would violate the precept that § 1983 provides a remedy "as broad as the protection of the Fourteenth Amendment affords the individual". *Lugar, supra,* at 934, 102 S.Ct. at 2752.

Our ruling in *Dieffenbach v. Attorney General of Vermont,* 604 F.2d 187 (2d Cir. 1979), supports the conclusion that a party acting pursuant to a state court judgment is not necessarily insulated from the reach of § 1983. In *Dieffenbach* we found that a bank was subject to suit under § 1983 when it utilized an allegedly unconstitutional foreclosure procedure to enforce a judgment against a mortgagor. We noted that in order to execute the judgment the bank was required to obtain a decree of foreclosure and that possession could only be gained by obtaining a writ from the clerk of the court which must be executed by a sheriff. *Id.* at 194 and n. 12.

Finally, we note that Texaco's challenge to the state bond and lien provisions does not call into question the validity

of the underlying judgment. Thus this is not a case where a private party is alleged to be a state actor merely because it brought suit and sought a judicial ruling. *See Dennis v. Sparks*, 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *cf. Cobb v. Georgia Power Co.*, 757 F.2d 1248 (11th Cir.1985) (party who seeks temporary restraining order is not joint actor with judge who issues the order); *Dahlberg v. Becker*, 748 F.2d 85, 92–93 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985) (private party did not act jointly with state when she misused lawful state procedure and judge inadvertently issued contempt order). In such a case the independent judgment of the state judiciary is called into play, and unless unusual circumstances are shown, *see, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 162–71, 90 S.Ct. 1598, 1611–15, 26 L.Ed.2d 142 (1970); *cf. United States v. Price*, 383 U.S. 787, 794–96, 86 S.Ct. 1152, 1156–58, 16 L.Ed.2d 267 (1966) (18 U.S.C. § 242), a private party cannot be charged with responsibility for a judicial decision. Rather, Texaco claims that the state enforcement procedures are unconstitutional as applied. Since Texas law directs state officials to do Pennzoil's bidding in executing the judgment, it is the decision of Pennzoil, not that of the state judiciary, to utilize state agents to undertake the collection process, and the state officials can act only upon Pennzoil's unilateral determination. *Lugar, supra,* 457 U.S. at 941, 102 S.Ct. at 2755.

The facts of this case, therefore, compel the conclusion that in enforcing the Texas state court judgment, Pennzoil must, of necessity, act jointly with the state of Texas.

■ Having concluded that federal jurisdiction exists over the § 1983 claims as-serted in Texaco's Third and Sixth Claims, we need not tarry over Pennzoil's argument that injunctive relief against enforcement of the Texas action is barred by the Anti-Injunction Act, 28 U.S.C. § 2283, which prohibits federal courts from enjoining state judicial proceedings "except as expressly authorized by Act of Congress".[10] Since an action under § 1983 constitutes just such an exception, *Mitchum, supra,* § 2283 does not bar Texaco's claims.

*Whether Abstention from Exercise of Federal Jurisdiction is Required*

■ There remains the question of whether federal jurisdiction over the § 1983 claims must be exercised or whether we should refrain from doing so under the doctrine of "abstention". In certain circumstances, concern for federalism, comity, and judicial economy suggests that federal courts abstain from entertaining § 1983 cases. Abstention, however, is the exception, not the rule. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483, *rehearing denied,* 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). It is appropriate in only four relatively well-defined circumstances. *Moses H. Cone, supra,* 460 U.S. at 13–16, 103 S.Ct. at 935–37; *Colorado River, supra,* 424 U.S. at 814–19, 96 S.Ct. at 1244–47. Pennzoil contends that two of those circumstances exist here.[11] We disagree.

**10.** 28 U.S.C. § 2283 reads:

    **"2283. Stay of State court proceedings**

    "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

**11.** Pennzoil concedes that two of the four circumstances, the so-called *Burford* exception, named after *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and the "exceptional circumstances" doctrine enunciated in *Colorado River, supra,* 424 U.S. at 818, 96 S.Ct. at 1246, do not apply in the present case. *Burford* calls for federal courts to decline jurisdiction "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result of the case at

One of the two abstention doctrines urged upon us by Pennzoil, which was formulated by the Supreme Court in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941), establishes that "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority, supra,* 104 S.Ct. at 2327. *See also Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 480 n. 11, 97 S.Ct. 1898, 1904 n. 11, 52 L.Ed.2d 513 (1977). When determining whether *Pullman* demands abstention in a particular case, however, "the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts *might* render ajudication of the federal question unnecessary. Rather ... abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Hawaii Housing Authority, supra,* 104 S.Ct. at 2327. Accordingly, *Pullman* abstention is not appropriate merely to give the state court a first chance to vindicate a federal claim, *Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967), or when the possibility that state courts will provide a construction limiting the statute is "too speculative to justify or require avoidance of the question present-

ed." *Ohio Bureau of Employment, supra,* 431 U.S. at 481, 97 S.Ct. at 1905.

The meaning of the Texas lien and bond provisions is far from uncertain. On the contrary, the language of Tex.R.Civ.P. 364 and Tex.Prop.Code Ann. §§ 52.001 *et seq.,* is crystal clear. To suspend enforcement of a judgment pending appeal the appellant must post a bond in at least the full amount of the judgment. *See* Texas court decision cited *supra,* p. 1138–39. Texas courts have refused to reduce supersedeas bonds below the amount dictated by Rule 364 even though the party seeking to appeal the decision claimed he could not post the required amount. *Mudd v. Mudd,* 665 S.W.2d 128 (Tex.Civ.App.1983). Indeed, Rule 364's predecessor, Art. 2270, Vernon's Ann.Civ.Stat., was similarly construed by Texas courts. *Anderson v. Pioneer Building & Loan Ass'n,* 150 S.W.2d 445 (Tex. Civ.App.1941) (refusing to stay foreclosure and sale of home of 66-year-old woman, whose only income was her old-age pension, because she could not post supersedeas bond equal to the value of house). *See also Elliott v. Lester,* 126 S.W.2d 756, 759 (Tex.Civ.App.1939); *Bryan v. Luhning,* 106 S.W.2d 403, 404–05 (Tex.Civ.App.1937); *Dunlap v. Rotge,* 85 S.W.2d 650, 651 (Tex. Civ.App.1935); *Cleveland v. Alpine Lumber Co.,* 70 S.W.2d 257, 257 (Tex.Civ.App. 1934).[12] Since there is nothing unclear or uncertain about the Texas lien and bond

bar ... [or when] exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern", *Colorado River, supra,* 424 U.S. at 814, 96 S.Ct. at 1244. The "exceptional circumstances" doctrine applies to the rare case where "consideration of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" demand abstention. *Moses H. Cone, supra,* 460 U.S. at 15, 103 S.Ct. at 936 (quoting *Colorado River, supra,* 424 U.S. at 817, 96 S.Ct. at 1246). Courts must weigh a range of factors when determining whether "exceptional circumstances" abstention is in order. *Moses H. Cone, supra,* 460 U.S. at 15–16, 103 S.Ct. at 936–37.

**12.** *Dillingham v. Putnam,* 14 S.W. 303 (Tex. 1890) (quoted with approval in *Nelson v. Kru-*

*sen,* 678 S.W.2d 918, 921–22 (Tex.1984)), held that a law conditioning the right of appeal on posting a supersedeas bond, regardless of whether appellant could post the bond, violated the Texas constitution's guarantee of the right to appeal. The law, however, unlike the lien and bond provisions at issue here, barred litigants from appealing. The cases cited *supra* demonstrate that the Texas courts have not read *Dillingham* to protect the right to stay enforcement of judgments pending appeal. Furthermore, *Pullman* abstention may not be predicated on the possibility that a state court could interpret the broad language of the state constitution to overrule a state statute or rule. *Hawaii Housing Authority, supra,* 104 S.Ct. at 2327 n. 4; *Examining Board v. Flores de Otero,* 426 U.S. 572, 598, 96 S.Ct. 2264, 2279, 49 L.Ed.2d 65 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 438–39, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971).

provisions here and the mere possibility that the Texas courts would find Rule 364 unconstitutional as applied does not call for *Pullman* abstention, *Zwickler, supra,* 389 U.S. at 251, 88 S.Ct. at 397, this type of abstention cannot be justified.

Pennzoil also argues that *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny required the district court to abstain. *Younger* counsels "federal courts to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." *Hawaii Housing Authority,* 104 S.Ct. at 2327-28. For *Younger* to apply three conditions must be present: (1) "important", "substantial" or "vital" state interests must be at stake, and (2) state procedures must be available to provide an adequate opportunity for the appellant to raise his federal claims in a state court, and (3) there must be an on-going state proceeding. *Middlesex Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); *Moore v. Sims,* 442 U.S. 415, 423-25, 99 S.Ct. 2371, 2377-78, 60 L.Ed.2d 994 (1979). Since the third condition is clearly met in the present case, we need not discuss it.

With respect to the first of these essential elements of *Younger* abstention, Pennzoil asserts that two substantial Texas interests are at stake in this case: Texas' interest in protecting the rights of its citizens to obtain and enforce judgments in the Texas courts and Texas' interest in the constitutionality of its statutes. Every state, however, has similar interests in every state proceeding. Accepting Pennzoil's argument that these interests are sufficient to mandate abstention would broaden *Younger* to cover almost every § 1983 case and thus undermine the Supreme Court's holding in *Mitchum, supra,* that federal courts are empowered by § 1983 to enjoin ongoing state proceedings. Not surprisingly, *Younger* and its progeny call for no such expansion. Pennzoil's contention would also render meaningless and unnecessary the exercise, regularly engaged in by federal courts called upon to abstain, of analyzing the state interests and remedies involved to determine whether *Younger* abstention is mandated. *See, e.g., Traughber v. Beauchane,* 760 F.2d 673, 680-81 (6th Cir.1985); *Miofsky v. Superior Court of State of Cal.,* 703 F.2d 332, 336-38 (9th Cir.1983).

The state interests at stake in this proceeding differ in both kind and degree from those present in the six cases in which the Supreme Court held that *Younger* applied.[13] In each of those cases the state government or a state official was a party to the action which the federal court was being asked to enjoin and had a direct stake in the outcome since the state action was taken for the purpose of vindicating a particular state policy or remedying an infraction of state law. *See Middlesex Ethics Comm., supra* (federal court should abstain from enjoining agency of state Supreme Court from bringing state disciplinary proceeding against lawyer); *Moore, supra* (federal court should abstain from enjoining state action by state Department of Human Resources seeking emergency order under state Family Code to protect children from parental abuse); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (federal court should abstain from enjoining state court proceeding by state Department of Public Assistance to recover welfare money paid the defendants when they misrepresented their worth in applying for aid); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (federal court should abstain from enjoining state court judges from enforcing order punishing appellant by jailing him for contempt); *Huffman, supra* (federal court

---

13. *Middlesex Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger v. Harris,* 402 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

should abstain from enjoining sheriff and county prosecutor from enforcing state civil nuisance statute); *Younger, supra,* (federal court should abstain from enjoining state criminal proceeding). The present case is dramatically different. Here the state has no interest in the underlying action. It is a suit between two private parties stemming from the defendant's alleged tortious interference with the plaintiff's contract with a third private party. An injunction here does not prevent any arm of the state from acting to vindicate a state policy or to punish an infraction of state rules.

Pennzoil argues that the court's holding in *Juidice v. Vail, supra,* to the effect that a federal court must abstain from enjoining a state judge from enforcing a contempt order demonstrates that the state has a substantial interest in the process by which it "protects the rights adjudicated in ... [its] courts, and enables prevailing parties to satisfy ... judgments." *Juidice,* however, cannot be read so broadly. The Supreme Court there emphasized that its holding turned on the fact that the contempt power was the weapon used directly by the state courts to protect their authority. The contempt power, the court noted, is the means by which the state "vindicates the regular operation of its judicial system.... The contempt power lies at the core of the administration of a State's judicial system." *Juidice, supra,* 430 U.S. at 335, 97 S.Ct. at 1217. "Contempt ... serves, of course, to vindicate and preserve the private interests of competing litigants, ... but its purpose is by no means spent upon purely private concerns. It stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory." *Id.* at 336 n. 12, 92 S.Ct. at 1217 n. 12. In the present case, Texas' limited interest in insuring that the interests of private litigants such as Pennzoil are preserved does not rise to the level of a state's interest in safeguarding the basic power of its courts through contempt proceedings.

The relatively minor Texas state interest in the present case is further attested to by the fact that we are not called upon to declare the Texas lien and bond provisions to be unconstitutional on their face but only as applied to the unique and extraordinary circumstances of this case, which are unlikely ever to recur because here obtaining a $12 billion bond is impossible. Our exercise of federal jurisdiction under § 1983 does not open any floodgates. On the contrary, ours is a narrow holding limited to the unusual circumstances of this case. The Texas lien and bond provisions will in most other circumstances continue to be respected and enforced as written by the Texas legislature and the Texas Supreme Court. Thus our decision does not prevent the state from enforcing the policy behind the Texas lien and bond provisions, which is to insure that a judgment creditor's interest in a judgment will be protected during the pendency of an appeal. *Mudd v. Mudd,* 665 S.W.2d 128, 130 (Tex. Civ.App.1983); *Fortune v. McElhenney,* 645 S.W.2d 934, 935 (Tex.Civ.App.1983); *Cooper v. Bowser,* 583 S.W.2d 805, 807 (Tex.Civ.App.1979). The unconstitutionality of those provisions as applied in the *Pennzoil-Texaco* case does not nullify them with respect to judgments in other cases.

■ Nor has Pennzoil satisfied the second requirement for *Younger* abstention, that Texas state courts provide adequate procedures for adjudication of Texaco's federal claims. If resolution of those claims is to be effective, prompt judicial action is essential; time is of the essence. It appears unlikely that Texaco could have been assured of a decision from the Texas trial court on the constitutional issues, at least without the cooperation of Pennzoil, before that court lost its jurisdiction over the case in March 1986. Texaco's effort to discuss modification of Par. 7 in December 1985 was rebuffed. The motion before the Texas trial court for a new trial is still pending. In view of the plain language of the Texas bond provision and the consistent line of Texas decisions enforcing it as written, the Texas trial judge would in all probability deny relief sought on constitutional

grounds or leave the constitutional issues undecided until his jurisdiction expired.

Apparently recognizing the futility of Texaco's seeking to obtain a timely decision of its constitutional claims through the trial court and traditional appellate channels, Pennzoil urges that an application by Texaco to the Texas Supreme Court for a writ of mandamus ordering the trial court not to apply Rule 364(b) as written would satisfy the *Younger* requirements. We disagree. In the first place, the remedy of state court mandamus, which undoubtedly has been available in many cases denying *Younger* abstention, has never been regarded as an adequate state remedy for abstention purposes, in view of its status as an "extraordinary" writ to be granted only in exceptional circumstances. *Traughber, supra,* 760 F.2d at 684; *Holmes v. New York City Housing Authority,* 398 F.2d 262, 267 n. 7 (2d Cir.1968). Indeed, in *Hernandez v. Finley,* 471 F.Supp. 516 (N.D.Ill.1978), *summarily aff'd mem. sub nom. Quern v. Hernandez,* 440 U.S. 951, 99 S.Ct. 1488, 59 L.Ed.2d 765 (1979) (deciding *Trainor v. Hernandez, supra,* on remand), the Supreme Court affirmed the district court's finding that the remedies offered by the State of Illinois failed to "afford a plain, speedy, efficient and certain remedy for review of their federal claim", because they left review of a rejected federal claim to the discretion of the state's appellate courts. *Hernandez, supra,* 471 F.Supp. at 520. Neither the district court nor the Supreme Court suggested that the availability to the private litigant of an original action for relief in the Illinois Supreme Court (similar to mandamus), *Illinois Supreme Court Rules* 381–83, constituted an "adequate state remedy". Each time the Supreme Court has found that adequate state remedies existed for *Younger* purposes, the Court's conclusion has rested on the fact that the party seeking § 1983 relief could with certainty obtain a resolution of constitutional claims from the state courts. *See, e.g., Middlesex Ethics, supra,* 457 U.S. at 435–36, 102 S.Ct. at 2523; *Juidice, supra,* 430 U.S. at 337, 97 S.Ct. at 1218; *Moore, supra,* 442 U.S. at 423–27, 99 S.Ct. at 2377–79; *Huffman, supra,* 420 U.S. at 608, 95 S.Ct. at 1210.

Furthermore, we do not believe that mandamus, if granted, would provide Texaco an adequate and timely remedy. Under Texas law, mandamus "will not lie where no request or demand has been made for the performance of such act or where there has been no refusal to perform." *Dozier v. Wray,* 222 S.W.2d 178, 179 (Tex.Civ.App. 1949). *See also Kissam v. Williamson,* 545 S.W.2d 265, 267 (Tex.Civ.App.1976); *Ratcliff v. Dickson,* 495 S.W.2d 35, 36 (Tex. Civ.App.1973); *Cozby v. Clifton,* 265 S.W.2d 197, 198 (Tex.Civ.App.1954). Texaco would be required, accordingly, to expend precious time in requesting the trial court to disregard Rule 364, which as noted, that court would probably fail to do, before seeking mandamus relief. Furthermore, even if the Texas Supreme Court issued the writ, Texaco's problems would not be at an end. There is no assurance that the Texas appellate court would grant an immediate stay of execution pending its decision on the constitutionality of the Texas lien and bond provisions or fix security in a reasonable amount. Indeed, the Texas appellate court issuing a writ of mandamus *"will never prescribe what the decision of the subordinate court shall be, nor will the supervisory court interfere in any way to control the judgment or discretion of the subordinate court in disposing of the controversy."* *Pope v. Ferguson,* 445 S.W.2d 950, 953 (Tex.1969) (quoting *Ex parte Newman,* 81 U.S. 152, 165–66, 14 Wall. 152, 165–66, 20 L.Ed. 877 (1871)) (emphasis in original). Rather, the Texas Supreme Court will remand the case to the trial court with instructions to obey the law as the Texas Supreme Court interprets it. *Pope, supra,* 445 S.W.2d at 953. In the present case, that rule would require the Texas Supreme Court to leave it to the Texas trial court to hold the necessary hearings and fix the proper amount of the supersedeas bond. An effort by Texaco to obtain more timely relief from a Justice of the United States Supreme Court under § 1257 would not succeed since the Su-

preme Court would not grant a stay until the Texas Supreme Court had acted. *See National Socialist Party v. Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977); *Nebraska Press Assn. v. Stuart, Judge,* 423 U.S. 1327, 1329–30, 96 S.Ct. 251, 253–54, 46 L.Ed.2d 257 (1975) (Blackmun, J., in chambers). In the meantime, Par. 7 of the Texas judgment having long since expired, Pennzoil would have executed its $11.12 billion judgment, forcing Texaco down the path of no return.

*The Merits: Requirements for Preliminary Injunctive Relief*

There remains the question of whether, in light of the foregoing principles, the district court abused its discretion in granting relief. An abuse of discretion would exist if the court relied on clearly erroneous findings of fact or erroneous legal principles in issuing the injunction. *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 54 (2d Cir.1985).

In this circuit the standard for issuance of preliminary injunctive relief is well-settled. The plaintiff has the burden of showing irreparable harm *and* (1) either probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *plus* a balance of hardships tipping decidedly in the plaintiff's favor. *Kaplan v. Board of Education of the City School District of the City of New York,* 759 F.2d 256, 259 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The effect of the grant or withholding of such relief upon the public interest must also be considered. *Virginian Railway Co. v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937); *Stamicarbon, N.V. v. American Cyanamid Co.,* 506 F.2d 532 (2d Cir. 1974).

*Irreparable Harm*

It is beyond dispute that, absent injunctive relief, enforcement of Texas' lien and supersedeas bond provisions would rapidly produce a catastrophe of major proportions, causing substantial harm to Texaco itself and to thousands of others throughout the United States, including stockholders, customers, and suppliers. Pennzoil concedes that Texaco, although it has a liquidation value of $22 billion and a net worth of about $23 billion, could not possibly post a bond or security in the sum of the approximately $12 billion that is mandated by Tex.R.Civ.P. 364(b). The simultaneous attachment of a lien pursuant to Tex.Prop.Code Ann. §§ 52.001 *et seq.* on Texaco's real property in Texas, valued at $5 billion, would seal the company's fate. Unable to finance its operations or obtain credit lines needed for its continued existence, Texaco, the fifth largest business organization in the United States, would be forced into bankruptcy or liquidation. A large percentage of its 55,000 employees world-wide, with an annual payroll of $1.6 billion, would lose their jobs. Approximately 319,000 Texaco stockholders, who received $730 million in dividends in 1985, would suffer heavy losses.

Some idea of the proportions of the threatened catastrophe can be gathered from the undisputed financial crisis that occurred during the week following entry of the Texas judgment. Despite the temporary "stand-still" provisions of Par. 7 of that judgment Texaco's bonds were downgraded by Moody's from investment grade to non-investment grade. It was forced to withdraw from the commercial paper market. Banks with which it did business advised that they would no longer lend it money on unsecured terms because of uncertainties as to what would happen when Par. 7 expired in March 1986. Similarly, because of these uncertainties, potential joint venturers with Texaco cancelled negotiations with it, suppliers refused to do business with it on regular customary terms, and companies refused to negotiate deals for the purchase of Texaco assets. The extent of the harm threatened by enforcement of the Texas judgment is further attested to by some 58 interested parties including 12 states, that have filed amicus briefs or other papers urging that enforcement be enjoined.

In determining whether a threatened injury pending appeal is irreparable it becomes important not only to assess its nature and anticipated duration but whether the plaintiff can be restored to the *status quo ante* if the appeal should result in a reversal in his favor. The irreparability of the harm increases in proportion to its irreversibility. In most cases, if the judgment is reversed upon appeal, the attachment will be vacated and the property or the proceeds from its sale will be restored to the appellant. His sole harm will have been the deprivation of the use of the property or its monetary equivalent pending the appellate decision. But when, as in the present case, the interim injury is the irrevocable destruction of his business, resulting in bankruptcy or liquidation, a reversal will not undo the injury, which cannot be measured in damages and would in no event be recoverable. The evidence is equally persuasive that without injunctive relief the public interest would be adversely affected. *Virginia Ry. Co. v. System Federation, supra,* 300 U.S. at 552, 57 S.Ct. at 601.

We are not called upon to review the merits of the Texas action. Indeed, it was not within the district court's province to do so. Under *Rooker* that is exclusively the province of the Texas courts. We must accept for present purposes that Pennzoil has established to the satisfaction of a Texas jury and judge that it was unlawfully injured by Texaco's tortious conduct, that as a result Pennzoil suffered enormous damages, and that Texaco's conduct was sufficiently egregious to require it in addition to pay punitive damages to the victim. Only if Texaco's appeal were patently frivolous would we be justified in holding that any threatened harm to it from effective denial of its right of appeal could be labelled inconsequential. The issue before us, therefore, is not whether Texaco should have prevailed on the merits in the Texas action but whether its Texas appeal presents non-frivolous issues for resolution.

That Texaco has raised non-frivolous issues as the basis for its Texas appeal is clear. It argues (1) that the Texas trial court erred in not granting it a mistrial based on the acceptance by Texas Judge Anthony J.P. Farris, who presided over most of the 4-½–month trial until illness forced him to step down, of a $10,000 "campaign contribution" from Joseph D. Jamail, Esq., Pennzoil's lead trial counsel, while the case was pending before Judge Farris and without disclosure to Texaco; (2) that the successor Texas trial judge (Judge Casseb) refused to read the transcript of the testimony and proceedings that had occurred before Judge Farris and misapplied New York law (which the parties admit governed the case) with respect to (a) the essential elements of a claim of tortious interference with a contract, (b) when a punitive damages award is permissible, and (c) when a contract becomes legally enforceable; (3) that any contract between Getty and Pennzoil was void and unenforceable because it violated S.E.C. Rule 10b–13, the federal antitrust laws, state laws governing fiduciary duties of directors and controlling stockholders, and the Statute of Frauds, and was procured as the result of fraud or mutual mistake; (4) that an improper method was used to compute the award of $7.53 billion compensatory damages; and (5) that Texaco was entitled to judgment as a matter of law because the Texas judgment in Pennzoil's favor violated the Commerce, Supremacy, Full Faith and Credit, Due Process, and Equal Protection Clauses of the United States Constitution.

*Fair Grounds for Litigation and Favorable Balance of Hardships*

Having shown that without injunctive relief it would suffer irreparable injury, Texaco also had the burden of demonstrating that it has a substantial chance of success on the merits of the present action (as distinguished from the merits of its Texas appeal) or at least that it has raised fair grounds for litigation and that the balance of hardships tips in its favor. *Kaplan, supra,* 759 F.2d at 259. We are satisfied that Texaco's claim that the Texas bond

and lien provisions deny it due process presents a fair ground for litigation. Hence it becomes unnecessary to reach its claim that they also violate its equal protection rights.

■ The Texas constitution grants a right of appeal to all civil and criminal litigants. *Nelson v. Krusen,* 678 S.W.2d 918, 921 (Tex.1984); *Airco, Inc. v. Tijerina,* 603 S.W.2d 785 (Tex.1980); *Bay v. Mecom,* 393 S.W.2d 819, 820 (Tex.1965); *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303, 304–05 (Tex.1890); *Moore v. Wutke,* 145 S.W.2d 224, 226 (Tex.Civ.App.1940). Federal due process forbids the state from arbitrarily excluding certain parties from exercising that right. *Evitts v. Lucey,* — U.S. —, 105 S.Ct. 830, 840, 83 L.Ed.2d 821 (1985); *Griffin v. Illinois,* 351 U.S. 12, 17–20, 76 S.Ct. 585, 589–91, 100 L.Ed. 891 (1956). Furthermore, due process requires that, once the state has created a right of appeal, it must "offer each defendant a fair opportunity to obtain an adjudication on the merits of his appeal." *Evitts, supra,* 105 S.Ct. at 841. *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 429–30 & n. 5, 102 S.Ct. 1148, 1154–55 & n. 5, 71 L.Ed.2d 265 (1982). A state would deny a defendant such a "fair opportunity" if it reduced the appeal to a "meaningless ritual" by denying him the means effectively to press his appellate arguments, *Douglas v. California,* 372 U.S. 353, 358, 83 S.Ct. 814, 817, 9 L.Ed.2d 811 (1963) (right to counsel in criminal appeals). *See also Evitts, supra* (right to effective assistance of counsel in criminal appeals). It is self-evident that an appeal would be futile if, by the time the appellate court considered his case, the appeal had by application of a bonding law been robbed of any effectiveness. *Cf. National Socialist Party v. Skokie,* 432 U.S. 43, 44, 97 S.Ct. 2205, 2206, 53 L.Ed.2d 96 (1977); *Nebraska Press Assn. v. Stuart,* 423 U.S. 1319, 1324–25, 96 S.Ct. 237, 239–40, 46 L.Ed.2d 199 (1975) (Blackmun, J., in chambers); *Times-Picayune Pub. Corp. v. Schulingkamp,* 419 U.S. 1301, 1305, 95 S.Ct. 1, 3, 42 L.Ed.2d 17 (1974) (Powell, J., in chambers); *Graves v. Barnes,* 405 U.S. 1201, 1203, 92 S.Ct. 752, 753, 30 L.Ed.2d 769 (1972) (Powell, J., in chambers).

■ Thus an inflexible requirement for impressment of a lien and denial of a stay of execution unless a supersedeas bond in the full amount of the judgment is posted can in some circumstances be irrational, unnecessary, and self-defeating, amounting to a confiscation of the judgment debtor's property without due process. A serious question presenting fair grounds for litigation is therefore raised by Texaco's claim that enforcement of Texas' lien and bond requirements would reduce its appeal to a meaningless ritual. Since Texaco would be bankrupt or in liquidation by the time its appeals were decided the hardship to it would be immeasurable, irrevocable, and irremediable by reversal of the judgment on the merits.

■ Against the hardship to Texaco from denial of a stay the district court was required to balance the threat to Pennzoil's interests caused by granting the stay. A judgment creditor's primary concern when a judgment in his favor is stayed pending appeal is that he be "secure ... from loss resulting from the stay of execution." *Federal Prescription Serv. v. Am. Pharm. Ass'n,* 636 F.2d 755, 760 (D.C.Cir.1980). *See also C. Albert Sauter Co. v. Richard S. Sauter, Co.,* 368 F.Supp. 501, 520 (E.D. Pa.1973). In making that determination we look to general equitable principles. Accordingly, when setting supersedeas bonds courts seek to protect judgment creditors as fully as possible without irreparably injuring judgment debtors. *Federal Prescription Service, supra,* 636 F.2d at 760; *Poplar Grove Planting & Refining Co. v. Bache, Halsey, Stuart, Inc.,* 600 F.2d 1189, 1191 (5th Cir.1979). *United States v. Kurtz,* 528 F.Supp. 1113, 1115 (E.D.Pa. 1981); *C. Albert Sauter Co. v. Richard S. Sauter Co., supra,* 368 F.Supp. at 520; *Trans World Airlines, Inc. v. Hughes,* 314 F.Supp. 94 (S.D.N.Y.1970), *aff'd in relevant part,* 515 F.2d 173 (2d Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). A full supersedeas

bond may be required "where there is some reasonable likelihood of the judgment debtor's inability or unwillingness to satisfy the judgment in full upon ultimate disposition of the case and where posting adequate security is practicable", whereas no bond or a reduced bond would suffice when the creditor's interest, due to unusual circumstances, would not be unduly endangered. *Federal Prescription Service, supra,* 636 F.2d at 760. The court "may order partially secured or unsecured stays if they do not unduly endanger the judgment creditor's interest in ultimate recovery." *Id.* at 760–61. *See, e.g., Trans World Airlines, supra* ($75 million bond to secure judgment of $145,448,140); *Sauter, supra* ($100,000 bond, stock placed in escrow, and restrictions imposed on financial commitments, to secure judgment of $1.2 million); *cf. International Telemeter v. Hamlin International Corp.,* 754 F.2d 1492, 1495 (9th Cir. 1985) (appellant can be required to secure the judgment in ways other than by a supersedeas bond); *United States v. Kurtz,* 528 F.Supp. 1113, 1115 (E.D.Pa. 1981) (full bond not required if it would be "impossible or impractical" provided appellant proposes a "plan that [would] provide adequate security for the appellee").

In the present case there is no serious dispute that, should Texaco be required to liquidate its substantial assets, it would be able to pay Pennzoil's judgment in full. Texaco's financial statement shows that, as of December 31, 1984, it had an appraised net worth of $22.622 billion. Indeed, on November 22, 1985, J. Hugh Liedtke, Chairman of Pennzoil's Board, stated that the liquidation value of Texaco was at least $22 billion and that "he did not doubt Texaco's ability to pay the damages." On December 6, 1985, he followed this statement up with the observation that "Texaco has $37 billion in assets," and that, "[a]fter paying off all the debts that they currently owe … some 11 billion dollars … they still have 26 billion and it's very adequate to cover what they owe us."

Thus Pennzoil's interest in protecting the full amount of its judgment during the appellate process is reasonably secured by the substantial excess of Texaco's net worth over the amount of Pennzoil's judgment. This undisputed evidence indicates that little, if any, security is required to protect Pennzoil's judgment pending appeal and that its pressure to apply the Texas lien and supersedeas bond requirements may, as Texaco charges, be motivated more by Pennzoil's understandable desire to obtain a favorable settlement of the Texas action than by genuine concerns about possible inability to collect if its judgment should be affirmed on appeal.

The hardship to Pennzoil from a grant of injunctive relief is, therefore, heavily outweighed by that which Texaco would suffer from the denial of such relief. Although a grant of injunctive relief deprives Pennzoil for the time being of a $5 billion lien and immediate execution of its judgment under Rule 364, it eventually will, in the event that its judgment is affirmed and the Texas lien and bond provisions are upheld, be in substantially the same position as it was prior to the issuance of injunctive relief. It could then avail itself of the Texas lien and bond provisions and, if Texaco should be placed in bankruptcy, it would have the same creditor status as it would have had in the immediate bankruptcy that would have occurred in the absence of injunctive relief. There is no evidence that Texaco, a publicly held corporation, would seek to encumber its property other than as would be necessary in the ordinary course of business or that it would transfer any of its assets to defraud Pennzoil. If any such evidence were adduced, Pennzoil would be justified in moving before the district court for a modification of the injunction.

The district judge did not apply the foregoing equitable rules in formulating the terms of the preliminary injunction. Instead he reviewed the Texas trial and judgment on the merits (but without benefit of the trial record), concluding that at most Pennzoil would be entitled to recovery of $800 million to which he added a $200 million allowance for costs, interest and attor-

ney's fees in requiring that security of $1 billion be posted. This procedure was clearly erroneous and impermissible as a matter of law.

Normally we would remand the case to the district court to reconsider the terms of the preliminary injunction in light of this opinion. *Poplar Grove, supra,* 600 F.2d at 1191. However, that course does not appear to be necessary. The district judge acted entirely on the basis of affidavits which did not involve credibility issues. The facts relied upon by us in our foregoing analysis are undisputed. Time continues to be of the essence. Moreover, Texaco has now posted the $1 billion security required by the district court even though application of equitable principles may have justified a bond in a lesser amount.

The preliminary injunction must therefore stand, subject to such applications as may be made by the parties, based on new evidence or a change in circumstances, with respect to the terms of security to be furnished in lieu of or in addition to the $1 billion security already posted. We do not view the terms of the preliminary injunction to be contrary to or inconsistent with those of Par. 7 of the Texas judgment, which remain in force and must be obeyed until they expire. Absent a proffer of additional evidence with respect to the merits of the present federal action, a hearing on the merits would appear to be unnecessary pending final disposition of the appeals of the Texas judgment.

Pennzoil argues, however, that any necessity for preliminary relief is dispelled by its "stipulation" that the Texas trial court may apply the standards of Fed.R.Civ.P. 62 to determine the security required of Texaco pending appeal. Pennzoil's "stipulation" does not solve the problems Texaco faces in this action. It has not been accepted by Judge Casseb or agreed to by Texaco, it does not waive Pennzoil's right to demand a supersedeas bond in the full amount of the judgment, and Pennzoil has reserved its right to seek such a bond. The "stipulation" is simply Pennzoil's unilateral

request to the Texas trial court to apply the procedural rule of another jurisdiction. It is doubtful that a Texas state court, whose function is to apply Texas law, would consider itself any more jurisdictionally obligated, much less willing, to obey Pennzoil's request than it would be to apply Chinese or Russian procedural law simply because one party requested it. As noted in the *Restatement (Second), Conflict of Laws* § 122 (comment a) (1971), a forum "has compelling reasons" for applying its own procedural rules and "enormous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration, such as ... mode of trial and execution". *See also Restatement, supra* at § 131.

Texas courts have recognized that its rules of procedure are designed to promote procedural uniformity. *Rice v. Thompson,* 239 S.W.2d 137, 139 (Tex.Civ.App.1951). Accordingly, "[i]t is not optional with trial or appellate courts to disregard [Texas procedural rules] because they do not meet with the approval of such courts." *Pearl Assur. Co. v. Williams,* 167 S.W.2d 808, 810 (Tex.Civ.App.1942). *See generally,* 1 R. McDonald, *Texas Civil Practice,* § 0.04, at 6–10 (1981) (individual attorneys and the trial court are not free to rework rules of procedure). Furthermore, Texaco's refusal to agree to the stipulation is understandable, in view of the likelihood that a Texas state court accustomed to the Texas lien and bond provisions would interpret Rule 62 as consistently as possible with those provisions rather than exercise the wide discretion used by federal judges in ruling upon such applications. If Pennzoil had offered to accept a bond in a specific amount, our views might be different. *See Yandell v. Tarrant State Bank,* 538 S.W.2d 684, 687 (Tex.Civ.App.1976); *United Benefit F. Ins. Co. v. Metropolitan Plumbing Co.,* 363 S.W.2d 843, 847 (Tex. Civ.App.1962); *Zurich General Accident & Liability Ins. Co. v. Fort Worth Laundry Co.,* 63 S.W.2d 236, 237 (Tex.Civ.App. 1933). But its Rule 62 offer does not justify denial of injunctive relief in this action.

## CONCLUSION

We conclude that federal jurisdiction exists over Texaco's claims that the mandatory Texas lien and bond provisions are unconstitutional as applied. The district court, moreover, was not required to abstain from exercising that jurisdiction.

We also conclude that the issuance of preliminary injunctive relief and requirement of $1 billion security as a condition thereof did not constitute an abuse of discretion. The district judge, however, clearly erred in assuming jurisdiction over other claims that had been adjudicated by the Texas court and in substituting his views for those of the Texas court and jury as to the application of New York law, the propriety of awarding punitive damages and the amount of compensatory damages that might properly have been awarded. Those issues rest solely within the jurisdiction of the Texas trial and appellate courts, which will give them careful consideration, and eventually with the United States Supreme Court, whose decision will be final.

We hasten to note that our decision rests partly upon the extraordinary circumstances of this case, which are unlikely ever again to recur: a private civil money judgment in an amount unprecedented in the annals of legal history, a clear inability on the part of the judgment debtor to comply with a state law mandating a bond in the full amount of the judgment pending appeal, the prospect that the state appellate court would not rule on the constitutionality of the state law before the judgment creditor acted to enforce the judgment, and the likelihood that immediate enforcement of the Texas lien and bond provisions would lead to irreversible destruction of the debtor before its appeal could be heard and decided on the merits, thus robbing its right of appeal of any meaning and effect. For these reasons our decision, like that of the Fifth Circuit in *Henry v. First National Bank of Clarksdale*, 595 F.2d 291 (5th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), is obviously a narrow one in its scope and application.

The grant of preliminary injunctive relief, as modified, is affirmed on condition that Texaco promptly and diligently prosecute its appeal in the Texas appellate courts. Our affirmance is without prejudice to the rights of Pennzoil, upon a showing of changed circumstances, to move in the district court for modification of the terms of the preliminary injunction.

We remand the case to the district court with directions to dismiss Texaco's First, Second, Fourth, Fifth and Seventh Claims and to modify its January 16, 1986, order in accordance with this opinion. The district court will retain jurisdiction, pending the final decision of Texaco's appeal on the merits pursuant to 28 U.S.C. § 1257, for the purpose of ruling on any applications with respect to the security terms of the injunction arising out of changed circumstances.