**CHRISTOPHER LaSALLE AND COMPANY, INC., Plaintiff,**

v.

**HELLER FINANCIAL, INC., Defendant.**

**No. 86 C 6001.**

United States District Court, N.D. Illinois, E.D.

Jan. 16, 1990.

Francine Schwartz Bober, Richard J. Lipschultz, Chicago, Ill., for plaintiff.

Dan K. Webb, Lawrence R. Desideri, Kenneth T. Kristl, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Christopher LaSalle and Company, Inc. ("Christopher") has sued Heller Financial, Inc. ("Heller") in a nine-count First Amended Verified Complaint ("Complaint"), alleging several federal constitutional and statutory violations as well as a number of pendent state law claims:[1]

1. Violation of the Supremacy Clause.

2. Violation of the Due Process Clause.

3. Violation of 42 U.S.C. § 1983 ("Section 1983").

4. Violation of Section 2–1203 of Illinois' Code of Civil Procedure ("Code § 2–1203," Ill.Rev.Stat. ch. 110, ¶ 2–1203).

5. Tortious Interference with Existing Business Relations.

6. Tortious Interference with Corporate Bank Account.

7. Conversion.

8. Violation of Section 12–701 of Illinois' Code of Civil Procedure ("Code § 12–701," Ill.Rev.Stat. ch. 110, ¶ 12–701).

9. Abuse of Process.

Heller has filed motions seeking:

1. to dismiss Counts 1, 2, 4, 6 and 8 pursuant to Fed.R.Civ.P. ("Rule") 12(b)(6); and

2. to obtain summary judgment on Count 3 under Rule 56.

---

1. What follows (except for the parenthetical insertions made by this Court) are the captions Christopher affixes to the Counts in the Complaint. Purely for convenience, this opinion will use Arabic numbers in referring to those Counts, even though the pleading itself (as is often the case) employs Roman numerals.

Christopher not only contests Heller's motions but has filed its own Rule 56 summary judgment motion on Counts 7, 8 and 9.

For the reasons stated in this memorandum opinion and order, all three federally-based claims in the Complaint—Counts 1, 2 and 3—are dispatched as a final matter. That being so, it is inappropriate under the circumstances to address the state law claims. This action is therefore dismissed in its entirety.[2]

### Factual Background [3]

In January 1985 Christopher was in the business of consolidating shipping orders for its clients to obtain discounted bulk shipping rates, taking as a commission a percentage of each customer's savings under the arrangement. Heller engaged Christopher to act for it in that manner.

On November 20, 1985 Heller filed suit against Christopher in the Circuit Court of Cook County, alleging breach of contract, breach of fiduciary duty, unjust enrichment and conversion—all arising out of Christopher's claimed breaches of duty in its handling of Heller's account. On February 6, 1986 Heller moved for a default judgment against Christopher for failure to file an answer. That motion was denied and Christopher was given until February 17 to respond.

Assertedly acting in reliance on an agreement with Heller as to settlement possibilities, Christopher still did not answer. Heller again moved for default, and this time the Circuit Court entered an order of default on March 19 and then a $42,884.61 default judgment on April 10.[4] Christopher's timely motion to vacate the default judgment was denied, as was its later request for a rehearing of the motion to vacate. On June 10 Christopher filed a Notice of Appeal to the Illinois Appellate Court challenging the propriety of the default judgment (see Rule 305(d)).

For Christopher to obtain a stay of execution of the default judgment pending appeal, Illinois Supreme Court Rule 305 ("Rule 305") required that Christopher post a supersedeas bond for an amount in excess of the judgment (see Rule 305(d)). As permitted by Rule 305(a)(2), the Circuit Court stayed execution of the judgment 45 days to allow Christopher an opportunity to obtain a bond. Lacking sufficient cash collateral, Christopher was unable to obtain a supersedeas bond before expiration of the 45-day stay period. On July 25 Christopher requested and the Appellate Court granted a ten-day temporary restraining order enjoining execution of the default judgment—that interim action was taken pending Heller's response to Christopher's effort to enjoin application of the supersedeas bond requirement. Without issuing an opinion the Appellate Court then denied the latter motion on August 5.

In a last-gasp effort to stave off execution of the default judgment, Christopher moved for reconsideration of the just-denied preliminary injunction motion and for reinstatement of the temporary restraining order pending such reconsideration. With the Appellate Court having taken no action on those motions, on August 13 Christopher filed this federal action to prevent Heller from executing on the judgment, asserting that:

1. Imposition of the Circuit Court's bond requirement violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, because it effectively prevented Christopher from pursuing an appeal.

2. All the steps leading to entry of the default judgment, and also the Circuit Court's refusal to vacate that judg-

---

**2.** Although no motion by either party has been directed to Count 5, it is subject to dismissal for the same reason discussed hereafter as to the other pendent claims.

**3.** What follows is the undisputed history of the underlying state litigation and of this lawsuit. Accordingly there is no need to be concerned

here with the differing standards applicable to motions under Rule 12(b)(6) (see n. 7) and Rule 56 (see n. 11).

**4.** That judgment, entered after an April 9 prove-up hearing as to damages, included $18,074.95 in actual damages, $24,000 in punitive damages and $809.66 in court costs.

ment, were so infected with procedural and substantive errors as to constitute denial of due process.

After holding an evidentiary hearing this Court granted the "Preliminary Injunction,"[5] finding in part (Preliminary Injunction at 7–8 (citations omitted)):

> Both the probability of success on the merits and the balancing of harms weigh heavily in Christopher's favor. Accordingly, the "sliding scale" approach to comparative evaluation appropriate in preliminary injunction cases tips substantially in Christopher's favor.

That same order implemented a Cash Control Reporting System to monitor Christopher's financial situation. Christopher's operations rocked along under the protection of the Preliminary Injunction for several months. Then, as a result of substantial deterioration in Christopher's financial condition, which tipped the balance of hardships in Heller's favor, this Court dissolved the Preliminary Injunction on March 24, 1987.[6]

On March 31, 1988 the Appellate Court vacated the Circuit Court's default judgment (*Heller Financial, Inc. v. Christopher LaSalle and Co.*, 168 Ill.App.3d 852, 119 Ill.Dec. 573, 523 N.E.2d 41 (1st Dist. 1988)). On September 9, 1988 Christopher filed the Complaint in substitution for its original Complaint.

*Heller's Motion To Dismiss Christopher's Federal Claims* [7]

Count 1: Violation of the Supremacy Clause

■ Christopher maintains that Rule 305 violates the Supremacy Clause because 28 U.S.C. § 1257 ("Section 1257") entitles a state court litigant "to seek review by the Supreme Court of the United States by a writ of certiorari taken from 'final judgment or decrees rendered by the highest Court of a State in which a decision could be had … where any … right, privilege, or immunity is … claimed under the constitution … or statutes of … the United States'" (Complaint ¶ 65). And, the argument goes, Rule 305 violates the Supremacy Clause (Complaint ¶ 66):

> By preventing Christopher from taking an appeal to the State Appellate Court and the State Supreme Court, in which review would otherwise be available as of right, application of Illinois' supersedeas bond requirements would have effectively prevented Christopher from exercising its federally created right to petition for certiorari under 28 U.S.C. 1257, thereby precluding any federal review of the Default Judgment.

Heller launches a double-barrelled attack on that claim, asserting (1) that the Supremacy Clause does not create enforceable rights under which individuals may bring suit and (2) that because Christopher

---

**5.** Of course Christopher's initial success in getting the Preliminary Injunction in no way controls the present decision on the merits. At the time of the Preliminary Injunction hearing Christopher, in addition to showing that it did not have a remedy at law and that it would suffer irreparable harm in the absence of the injunction (as well as satisfying the other non-merits preconditions for such interlocutory relief), adequately demonstrated that it had *some* likelihood of success on the merits. And the standard for showing some chances of success on the merits requires only that they be "better than negligible" (*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984)). With the then-recent Second Circuit opinion in *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133 (2d Cir.1986) having upheld a preliminary injunction in precisely the same setting, satisfaction of that threshold standard was easily achieved. But as discussed below, the legal

landscape has since changed, making the inquiries on the merits of this case much more complex.

**6.** After expiration of a one week stay of dissolution of the Preliminary Injunction, Christopher filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code"). That was later converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code. On July 27, 1988 Christopher voluntarily dismissed the bankruptcy proceedings.

**7.** On that motion, familiar Rule 12(b)(6) principles require this Court to accept as true all of Christopher's well-pleaded factual allegations, drawing all reasonable inferences in its favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)).

did in fact exercise its right to appeal, the Complaint fails to present a justiciable dispute in that respect.

*Golden State Transit Corp. v. City of Los Angeles,* — U.S. —, —, 110 S.Ct. 444, 452–53, 107 L.Ed.2d 420 (1989) (quoting *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 613, 99 S.Ct. 1905, 1913–14, 60 L.Ed.2d 508 (1979)) has recently reconfirmed (as Heller asserted and Christopher's Resp. Mem. 31 wisely conceded) that the Supremacy Clause does not give rise to direct causes of action: It rather safeguards the priority of federal rights when they conflict with state law. No such conflict exists here. Christopher's assertion that Illinois' supersedeas bond requirement impeded it from pursuing a state court appeal that "would otherwise be available as of right," thus unduly hampering its right to petition for certiorari under Section 1257, makes several leaps of logic that spell its own doom.

Christopher's argument rests on the premise that the bond requirement stopped it from taking an appeal—a course of action that it maintains would otherwise have been available as of right.[8] Whether that is fair characterization of the bond requirement is a question addressed later in this opinion. But for purposes of Christopher's Supremacy Clause claim, it is necessary to observe only that Section 1257 does not itself guarantee to a state court litigant the right to appeal to the State's highest court. Rather Section 1257 speaks only to the circumstances in which review may be had *after* a judgment is rendered by that highest court.

If Illinois had adopted a statutory provision mandating that decisions of the Illinois Supreme Court shall be the final and absolute statement on all questions of law from which no further review could be sought, that would pose a classic Supremacy Clause problem, with the Illinois provision directly conflicting with Section 1257. In that situation Section 1257 would, of course, have priority and the Illinois provision would be void.

But that is not the situation here. No Illinois law prevents anyone with a final judgment from the highest state court from petitioning for certiorari. Furthermore, Christopher has pointed to no federal provision (constitutional or statutory) that bars States from imposing any conditions whatever on the right to appeal to their highest courts—a provision with which Rule 305 might conflict. Indeed Christopher could not point to such a law, for neither the Constitution nor Congress concerns itself with the structure and rules of state courts—after all, basic federalism concerns would counsel against such an intrusion on the States' rights to manage their own judicial systems.[9]

Christopher's Resp. Mem. 31 attempts to recast that claim by characterizing Section 1257 as a statute securing equal rights within the meaning of 28 U.S.C. § 1343 ("Section 1343"). But such a strained coupling of those two statutes is wholly at odds with the history of Section 1343 as a source of federal jurisdiction and with the uniform case law construing and applying that statute as limited to laws "providing for specific civil rights stated in terms of racial equality" (*Georgia v. Rachel,* 384 U.S. 780, 788–92, 86 S.Ct. 1783, 1788–90, 16 L.Ed.2d 925 (1966) (quotation from *id.* at 792); *State of Wisconsin v. Glick,* 782 F.2d 670, 672 (7th Cir.1986, 86 S.Ct. at 1790)). Christopher's effort to restructure its claim in those terms must fail as well.

Because nothing in Rule 305 in any way conflicts with Section 1257, Count 1's Supremacy Clause claim is dismissed.[10] And because the claim is incapable of salvage, no leave to replead is granted.

---

8. For the present analysis, it is irrelevant whether or not Illinois law actually gives a litigant in Christopher's position a "right" to appeal to the Illinois Supreme Court.

9. Of course the States' systems must comport with the dictates of the Fourteenth Amendment.

But that inquiry (taken up below) must be separate from any consideration of Count I's Supremacy Clause claim.

10. That moots Heller's mootness argument directed to the same claim.

Count 2: Violation of the Due Process Clause

■ Count 2 alleges that "a series of fundamentally unfair procedural steps" resulted in the initial entry of the default judgment and violated Christopher's Fourteenth Amendment due process rights. Furthermore, Christopher argues, the Circuit Court's requirement of a supersedeas bond under Rule 305 rendered that violation permanent and irremediable.

*Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982) requires that the conduct alleged to have deprived a complainant of a federal right must be "fairly attributable" to the State to implicate Fourteenth Amendment protection. Two distinct inquiries inform the "fair attribution" question (*id.*):

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

Here the parties dispute that second requirement.

*Lugar*, 457 U.S. at 939, 102 S.Ct. at 2754–55 says that "something more" than a private party action taken pursuant to a state statute is necessary to merit the "state action" label. What that "something more" must be, *Lugar* teaches, varies with the circumstances of each case.

Heller maintains that its successful invocation of the legal system cannot alone transform it into a "state actor" because such invocation involves *nothing more* than private-party action. Because Count 2 challenges only the entry of the default judgment and the imposition of the bond requirement, and not Heller's later enforcement of the judgment, Heller argues it did nothing more than exercise its rights as a litigant: It simply moved for and received a money judgment and urged that the court impose a bond as a condition for a stay of enforcement. Thus Heller urges the princi-

ple articulated in *Dennis v. Sparks*, 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980)—that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge"—should prevent a finding of state action in this situation.

Christopher counters by contending that Heller acted jointly with the State because the state court's rules of procedure cede authority to the private litigant to determine when the opposing party is in default. Christopher attempts to analogize the situation to that presented by prejudgment garnishment cases such as *Lugar* and cases cited there. In those cases the Supreme Court found state action where, by way of a statutory framework, parties caused state officials to take action by filing petitions with those officials—in essence, where the private-party conduct sets the States' official machinery in motion. As Christopher would have it, the fact that the state court entered the default judgment *upon Heller's motion* makes this case the same as *Lugar* and justifies finding state action.

One obvious problem with that position is that it proves too much. After all, our entire adversarial judicial system relies exclusively on private parties' efforts to get the wheels of justice turning. That however does not (and cannot) mean that *every* court-granted motion can be considered state action by the litigant.

Christopher somehow thinks that the motion for default is substantially different from other motions and should therefore be singled out as making the movant a state actor. This Court does not agree. Christopher is just plain wrong when it says that "[t]he state motion courts rules of procedure cede authority to the private litigant to determine whether the opposing party is in default." To be sure, default motions by their very nature may be considered without a hearing unless one is requested by the opposing party. But that does not alter the fact that the *court,* not the individual, makes the ultimate determination as to default and enters the default order.

Illinois Code of Civil Procedure § 2–1301(a) (Ill.Rev.Stat. ch. 110, ¶ 2–1301(a)), captioned "Judgments–Default–Confession," specifically provides:

> The court shall determine the rights of the parties and grant to any party any affirmative relief to which the party may be entitled on the pleadings and proofs.

In light of that provision, Christopher's claim that Illinois cedes authority to private parties to adjudicate defaults is flatly incorrect. Consequently Christopher's attempt to characterize Heller as a state actor, dependent as it is on a basic mischaracterization of default procedures, must likewise fail. In the absence of state action, of course, the due process claim against Heller must be and is dismissed. Like the claim in Count 1, it too is nonsalvageable.

### Heller's Summary Judgment Motion [11]

Now to the heart of this lawsuit. Count 3 alleges that Heller violated Section 1983 by acting jointly with the State to destroy Christopher's right to an effective appeal as guaranteed by Illinois state law and by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Both parties agree that the Illinois Constitution affords Christopher the right to an appeal within the state appellate system and that the Due Process and Equal Protection Clauses prevent Illinois from burdening that right arbitrarily or unreasonably. Where the litigants part company is over whether or not Illinois' supersedeas bond requirement unconstitutionally burdens Christopher's right to appeal.

At the outset it is important to note the fundamental difference between Count 3 and just-discussed Count 2. That is not simply a function of the distinction between a claim grounded in Section 1983 (Count 3) and one premised directly on the Constitution (Count 2), under which the relevant attributability inquiry now becomes whether Heller acted under color of state law and not whether it was a state actor. Although that distinction may sometimes make a difference,[12] in this instance their substantial overlap makes it unnecessary to address their areas of departure.

What is more important here is that the two counts contemplate totally distinct bases for liability. Count 3 does not challenge the allegedly unfair entry of the default judgment, rendered permanent by the supersedeas bond requirement. It rather complains that the application of the supersedeas bond requirement in the circumstances of this case, together with Heller's later execution on the underlying judgment upon Christopher's failure to post the bond, prevented Christopher from pursuing a meaningful appeal by destroying it as an entity before it could complete its appeal. Thus Count 3 objects to more than Heller's mere successful invocation of the legal system: It objects to Heller's joint activity with State officials in enforcement of the judgment.

Upon Christopher's failure to post the required bond, Heller began executing on the judgment pursuant to Code § 12–701 by filing affidavits for garnishment with the Clerk of the Circuit Court. Those affidavits triggered the Clerk's issuance of garnishment summonses against the persons named in the affidavits, requiring them to appear and answer as garnishees. Execution of the judgment necessarily involved the concerted effort of Heller *and* the Clerk, thus rendering any resulting

---

11. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where cross-motions for summary judgment are involved, as here, that ordinarily calls for application of a dual perspective—but in this instance only Heller's motion on Count 3 has to be decided, so on that score Christopher gets the benefit of any required inferences.

12. "Under color of state law" for purposes of Section 1983 and "state action" for purposes of the Fourteenth Amendment are related but not identical requirements. For an extensive discussion of the relationship of the two provisions, see *Lugar*, 457 U.S. at 935 n. 18, 102 S.Ct. at 2752–53 n. 18.

deprivation "fairly attributable to the State" as required by *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753–54. Simply put, the *Lugar* holding that the private use of state prejudgment attachment procedures with the help of state officers constituted state action requires the parallel finding that Heller acted under color of state law in this case.

For that purpose the one possible distinction between the two situations—the post-judgment character of the attachment at issue here as opposed to the prejudgment nature of the attachment in *Lugar*—does not call for a different result. This Court agrees with and adopts the reasoning expressed by the Court of Appeals for the Second Circuit in its comparable finding of state action by Pennzoil in its use of the Texas postjudgment attachment procedures in *Texaco*, 784 F.2d at 1146 (citation omitted), *rev'd on other grounds sub nom. Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987):

> To limit the *Lugar* rationale to prejudgment attachments would violate the precept that § 1983 provides a remedy "as broad as the protection of the Fourteenth Amendment affords the individual." [13]

With the under-color-of-state-law inquiry having been answered in the affirmative, the sole remaining question is whether

Christopher can show that it was deprived of some federally protected right by Heller's action. That thorny question provoked much debate without finding ultimate resolution in the *Texaco* litigation—leaving this Court with the guidance of several Justices' individual opinions but no binding or authoritative teaching on the central issue.[14]

■ Like Texaco, Christopher does not here challenge the constitutionality of the bond provision on its face, but rather urges that its application in these circumstances violates due process and equal protection. Basically the issue boils down to whether, where the financial inability to post a bond has the corollary effect of destroying a litigant pursuing the appeal from a money judgment, that litigant is deprived of a meaningful right to appeal by the absence of a stay of execution of that judgment pending appeal. Here Christopher's required bond came to less than $50,000, an amount dwarfed by the $11 billion required of Texaco. But regardless of the vast difference in amounts, the bond requirements had precisely the same effect on Christopher and Texaco: Neither could post the required bond and neither could survive the pendency of an appeal as an ongoing entity in the absence of a stay of enforcement.[15] For each the bond requirement trans-

13. [Footnote by this Court] Justices Brennan, Marshall, Blackmun and Stevens all expressed agreement with finding action under color of state law in such circumstances in their respective opinions in *Pennzoil*, 481 U.S. at 19, 107 S.Ct. at 1530 (Brennan, J., concurring), at 23, 107 S.Ct. at 1532 (Marshall, J., concurring), at 27, 107 S.Ct. at 1534 (Blackmun, J., concurring) and at 30 (Stevens, J., concurring). Justice Powell's majority opinion found it unnecessary to reach the issue (*id.* at 18, 107 S.Ct. at 1529–30) because the case was disposed of on abstention grounds.

14. That issue had been dealt with directly by the *Texaco* Court of Appeals, which held (784 F.2d at 1145) that enforcement of the Texas bond and lien provision against Texaco would amount to a deprivation of Texaco's property in violation of its due process rights by destroying it as an entity and rendering its right to an appeal "an exercise in futility." Without addressing the substantive merits of that holding, the Supreme Court majority (481 U.S. at 18, 107 S.Ct. at 1529–30) reversed the decision below because the federal courts should have ab-

stained from taking jurisdiction until the Texas courts had rendered a final decision on a federal issue presented by the litigation. Justices Brennan, Marshall and Stevens concurred in the Court's opinion but expressed disagreement with the Second Circuit's substantive holding. Justice Blackmun also concurred, but he expressed support for the Second Circuit's conclusion that finding a constitutional violation was possible on the facts of the case.

15. This similarity is the critical factor in addressing the underlying constitutional issues, for as both Justices Marshall and Stevens noted in their concurrences the resolution of the constitutional questions should be independent of the amount of money at stake. As Justice Marshall stated in *Pennzoil*, 481 U.S. at 27, 107 S.Ct. at 1534:

> The principles which would have governed with $10,000 at stake should also govern when thousands have become billions. That is the essence of equal justice under law.

formed the adverse trial court judgment into an unavoidable trip into bankruptcy.

Obviously Christopher is not asserting (and could not assert) that it has a federally protected right to a state court appeal. It is well settled that the Constitution does not oblige the States to provide for appeals as of right in either the criminal setting (*Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985)) or the civil context (*Pennzoil,* 481 U.S. at 31 n. 4, 107 S.Ct. at 1536 n. 4 (Stevens, J., concurring and collecting cases)). Nonetheless *Evitts,* 469 U.S. at 393, 105 S.Ct. at 834 (citing *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956)) made it plain that once a State does establish an appellate system the Constitution requires that the system comport with the dictates of the Due Process and Equal Protection Clauses.

It takes only a moment's thought to recognize that the application of Rule 305, requiring Christopher to post a supersedeas bond as a condition of obtaining a stay, did not violate the Equal Protection Clause. *Evitts,* 469 U.S. at 405, 105 S.Ct. at 840–41 teaches that the equal protection inquiry "emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." Like the equal protection claim advanced in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 438, 102 S.Ct. 1148, 1159, 71 L.Ed.2d 265 (1982) (Blackmun, J., concurring), Christopher's claim here is an unconventional one—Rule 305 establishes no explicit classifications and does not expressly distinguish between litigants. But in application, Christopher argues, Rule 305 distinguishes between those who can afford to post a bond and those who cannot—granting the right to a meaningful appeal only to the former and not to the latter category, yet without furthering any rational state interest. At least two basic flaws call for rejection of that theory.

First, as the ultimate vacatur of the judgment in this case evidences, nothing in Rule 305 in any way inhibits a litigant from pursuing an appeal. Christopher maintains that its successful appeal was not meaningful because Heller's prior execution on the ultimately vacated judgment had already irreparably harmed Christopher. But that alone does not render the appeal meaningless: Heller's default judgment was in fact vacated, Christopher has the right to restitution of any funds taken in execution of that judgment (and, if a state court so determines, perhaps the added right to recover consequential damages sustained from Heller's conduct if that conduct is held to have been wrongful [16]), and it has the right to defend the underlying lawsuit on the merits. Christopher has undoubtedly suffered from its inability to obtain a stay, but it is an impermissible jump from that fact to any conclusion that its right to an appeal was eviscerated.

Second, even judgment debtors who *can* afford to obtain a stay are burdened (albeit to a lesser degree) by having to do so. They are deprived of access to the funds needed to secure the bond during the pendency of the appeal, and that alone could injure them in myriad ways.[17] Despite the fact that such lost opportunities also might or might not give rise to a right of recovery upon successful completion of the appeal (see text at n. 16) Christopher does not assert that those litigants have been deprived of their right to a meaningful appeal. Surely the differences in the harm caused to Christopher by its failing to obtain a stay and the harm caused to other litigants who do post bond are matters of degree and not of kind, and that means Christopher has failed to demonstrate that Rule 305 creates a classification scheme that accords intentionally disparate treatment to similarly situated people.

Indeed, were this Court to hold that the Equal Protection Clause bars a State from

---

**16.** And of course if Heller's conduct is *not* found to have been wrongful, so that Christopher does not have a right to recover such consequential damages, it would not appear to have just cause to complain in the legal sense.

**17.** It could for example (1) oblige them to pass up opportunities they could have otherwise taken advantage of, (2) imperil their ability to get additional financing or (3) inflict any number of other negative consequences.

applying that bond requirement where to do so would send the judgment debtor into bankruptcy before resolution of the appeal, that very holding would seem to engender an equal protection violation as against the judgment creditor. Any judgment creditor such as Heller would be forced to litigate the appeal without having any security for *its* judgment, while another judgment creditor who by luck of the draw had won judgment against a capital-rich defendant would not have to take the risk of having its judgment unsecured during the pendency of the appeal.[18] In that situation Heller could reasonably assert that *it* was denied equal protection because judgment creditors would receive varying degrees of protection based solely on the relationship between the amount of the judgment and the loser's financial situation, and not on any rational distinction between judgment creditors.

Finally, Christopher's due process claim also does not survive scrutiny under the circumstances of this case. As the above analysis suggests, and as Justices Brennan and Stevens both note in *Pennzoil*, 481 U.S. at 22, 107 S.Ct. at 1531–32 (Brennan, J., concurring) and at 32 (Stevens, J., concurring), the right to an appeal must be viewed separately from the right to a stay of judgment pending appeal.[19] In that sense a litigant's appeal is not rendered meaningless by the inability to stay execu-

tion of the judgment. And even if it were perceived differently, Christopher's claim is defeated by a reasoned evaluation of the place that a federal Section 1983 claim should properly play in the process.

■ It is a truism, but a vital one, that the Fourteenth Amendment does not protect against *all* liberty or property deprivations, but only against those inflicted without due process of law (*Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981)). That formulation demands an inquiry into what process is due in the particular situation before the Section 1983 court. *Parratt, id.* at 540, 101 S.Ct. at 1915 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)) teaches:

> The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and in a meaningful manner."

Despite Christopher's assertion to the contrary, Rule 305 meets that fundamental requirement. While Rule 305(a)(1) required a bond as a precondition to the stay of Heller's enforcement of its money judgment and Rule 305(d) mandated that the bond be in excess of the underlying judgment,[20] the trial court's initial setting of

---

18. That result would have the anomalous consequence of providing the security of a bond to the judgment creditors who are least in need of such security (because their judgment debtors are financially solid) while denying such security to the judgment creditors who need it most (because their judgment debtors are so shaky as to be on the verge of bankruptcy).

19. That principle finds historical support in Justice Holmes' opinion in *Louisville & N.R. Co. v. Stewart*, 241 U.S. 261, 263, 36 S.Ct. 586, 588, 60 L.Ed. 989 (1916) where he said, in discussing the state's power to charge interest on a judgment when execution is stayed by a bond pending appeal:

> There was no obligation upon the state to provide for a suspension of the judgment, and nothing to prevent its making it costly where ultimately the judgment is upheld.

Illinois courts have also recognized this principle, as in *Kurek v. Kavanagh, Scully, Sudow, White & Frederick*, 50 Ill.App.3d 1033, 1042, 8

Ill.Dec. 805, 811–12, 365 N.E.2d 1191, 1197–98 (3d Dist.1977):

> We have held that the right to appeal and the right to file a supersedeas bond are separate rights. The right to appeal is not dependent upon the filing of the bond. Therefore, an execution which takes the funds of the judgment debtor who might otherwise use those funds to post a supersedeas bond is not a denial of his right to appeal. It is a regular use of process to obtain a legitimate purpose—the collection of a money judgment.

20. Those provisions read (emphasis added):

> (a)(1) An appeal stays the enforcement of a judgment for money *only* if a notice of appeal is filed within 30 days after the entry of the judgment appealed from and a bond in a reasonable amount to secure the appellee is presented, approved, and filed within the same 30 days or within any extension of time granted under subparagraph (2) of this paragraph. Notice of the presentment of the bond shall be given to the appellee.

the bond is not the full extent of process provided by Rule 305. After the Circuit Court had ordered the filing of the supersedeas bond, Christopher had a full opportunity under the provisions of Rule 305(f) to present its case as to why that order should not stand:

> (f) After the case is docketed in the reviewing court, that court or a judge thereof upon motion may change the amount, terms or security of the bond whether fixed by it or by the trial court, and failure to comply with the order of the reviewing court or judge shall terminate the stay.

While the last phrase of the rule is directed at cases in which the reviewing court has increased the amount of the bond, nothing in the rule suggests that it does not authorize a reviewing court to reduce the amount of the bond required to obtain a stay. Indeed *Brucar v. Rubin*, 638 F.2d 987, 990–91 (7th Cir.1980) (per curiam) has implicitly recognized that Rule 305(f) allows for such a downward alteration.

Thus (1) the Illinois Appellate Court had full authority to grant the relief that Christopher now claims was essential to make its appeal possible without committing corporate suicide and (2) Christopher's July 25, 1986 motion to that court for a temporary restraining order and preliminary injunction was supported by an extensive (22-page) memorandum arguing directly (though unsuccessfully) against the bond requirement under the circumstances of this case. It must be concluded as a matter of law that Christopher was afforded all the process that it was due. After all, both in theory and in fact[21] Christopher had the full opportunity to marshal all its arguments—constitutional and otherwise—against conditioning its right to a stay on the posting of such a large bond. It simply failed to convince the reviewing court that its position merited relief. Surely there is no reason to believe that the Illinois Appellate Court shirked its responsibility to safeguard the constitutional rights of any litigant in considering that motion—and if Christopher believed otherwise, it had the right to seek review of *that* decision.[22]

In that light Christopher cannot now be heard to say that it was not afforded the right to be heard "at a meaningful time and in a meaningful manner." Without question its exercise of the right to tender a fully documented written motion containing extensive legal and factual arguments, and to do so to a court with the power to prevent the alleged deprivation, meets that standard. Moreover, Christopher was in fact afforded a ten-day restraining order preventing Heller's execution on the judgment pending consideration of that motion, so Christopher was not subjected to *any* "deprivation" until *after* it had been afforded an opportunity to argue its case for relief to the reviewing court.[23]

In summary, Illinois' decision to allow a litigant to challenge the bond requirement by motion to the reviewing court—an opportunity fully afforded to Christopher—comports with due process. Absence of a stay pending appeal does not render the right to appeal meaningless and therefore does not amount to a deprivation of any federal right. But even were that viewed differently, Rule 305's provision allowing a motion to the reviewing court to alter the amount of a bond provides all the process required by the Constitution.

---

> (d) If an appeal is from a judgment for money, the condition of the bond *shall be* for the prosecution of the appeal and the payment of judgment, interest, damages and the costs in case the judgment is affirmed or the appeal dismissed....

Neither litigant has provided any input, and this Court's own research has uncovered no reported case, to indicate whether the trial court does or does not have discretion to waive or to temper the Rule 305–dictated provisions as to the posting or amount of the bond. But for present purposes it will be assumed that the mandatory nature of the just-quoted language calls for a negative answer to that question.

**21.** Its July 25, 1986 memorandum raised all the constitutional arguments it advances in this action.

**22.** And of course the guaranty of "due process" is an assurance that proper procedure will be afforded, not necessarily that the correct conclusion will be reached by the court(s) affording that procedure.

**23.** See Appendix.

Thus Rule 305's requirement of a supersedeas bond in order to stay enforcement of a money judgment pending appeal violates neither the Equal Protection Clause nor the Due Process Clause. Heller's summary judgment motion as to Count 3 must be granted.

### Christopher's State Law Claims

█ All three of Christopher's federally-grounded claims have thus failed in ultimate terms. That being so, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966) and its progeny teach that this Court has the power (though it is not absolutely required) to dismiss—without prejudice, of course—Christopher's pendent state claims, which after all no longer have anything federal to which they are pendent.

*UMW v. Gibbs, id.* at 726, 86 S.Ct. at 1139 (citation and footnotes omitted) teaches that the dismissal of such state claims represents at least the preferable disposition where, as here, the federal claims are disposed of short of trial:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them.... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

In this case that preferable disposition—that exercise of the "doctrine of discretion" —is clearly indicated.

This Court has reviewed all the arguments tendered by the parties as to the several state-law claims sought to be advanced by Christopher. At least· two of those claims, those asserting private causes of action for alleged violations of Code § 2–1203 (Count 4) and Code § 12–701 (Count 8), would require this Court to explore seas as yet uncharted by the Illinois courts themselves. Our Court of Appeals frequently and properly reminds us that federal courts are *not* the appropriate forum for thus venturing beyond the frontiers already marked out by the Illinois courts themselves (see such cases as *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987); *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987); *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 942 (7th Cir.1986) and *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985).[24] And even as to the pendent claims other than those advanced in Counts 4 and 8—claims occupying more conventional areas of state law [25]—it is clearly preferable that any decisions as to their viability be made by a state court than by a federal court whose only permissible role is to mirror or to predict how a state court might be expected to rule on such claims.

**24.** No suggestion is made here as to whether an Illinois state court would or would not be prepared to recognize such novel claims. What *is* important is that the substantive decision on that score is for the state courts and not for a federal court in the first instance. Indeed, though the Court of Appeals directives to that effect have normally come in the context of diversity jurisdiction, no principled reason exists to distinguish between diversity and federal-question jurisdiction as to the propriety of a federal court exercising pendent jurisdiction over novel state law claims—in both situations prudence counsels restraint. *Gust K. Newberg's* citation of *Grubb v. W.A. Foote Memorial Hospi-*

*tal, Inc.*, 741 F.2d 1486, 1500 (6th Cir.1985), a Title VII case obviously in federal court on the basis of federal question jurisdiction, undermines any implication that our Court of Appeals intends the limitation on federal courts expanding state law to extend only to such courts sitting in diversity.

**25.** As stated at the outset of this opinion, those claims are for tortious interference with existing business relations (Count 5), tortious interference with corporate bank account (Count 6), conversion (Count 7) and abuse of process (Count 9).

In conclusion, then, the adverse resolution of Christopher's federal claims on their merits carries with it the purely procedural dismissal of all of Christopher's other claims. All claims asserted in Counts 4 through 9 are therefore dismissed for that reason.

## Conclusion

Complaint Counts 1 and 2 are dismissed—and given the reasons for their dismissal, Christopher is not given leave to replead either of those claims, so that their dismissal is with prejudice. As to Count 3 there is no genuine issue of material fact and Heller is entitled to a judgment as a matter of law. That claim too is dismissed with prejudice. Finally, Counts 4 through 9 are dismissed, but solely for the reasons identified in *UMW v. Gibbs*. In sum, this action is hereby dismissed in its entirety.

## Appendix

As the text preceding n. 23 reflects, Christopher cannot claim a Fourteenth-Amendment deprivation without due process because it was afforded a meaningful hearing by the Illinois Appellate Court before any asserted "deprivation" of Christopher's property rights took place. True enough, that result flowed from the Appellate Court's grant of a temporary restraining order barring execution of Heller's money judgment while the supersedeas bond issues were under consideration. Because the issuance of such a temporary restraining order is wholly discretionary, some *other* litigant who was unsuccessful in obtaining such interim relief might perhaps be faced with a post-deprivation rather than a pre-deprivation hearing of the issue before the Appellate Court[1]—but that hypothetical possibility is not something about which Christopher had standing to complain. That renders any consideration, in due process terms, of the status of a possible post-deprivation hearing pure dictum.

Nonetheless it may be worth noting that even such a possibility—one to which Christopher was not subjected—would not violate due process. *Parratt,* 451 U.S. at 540–41, 101 S.Ct. at 1915–16 (emphasis in original, footnote omitted) explains:

> [W]e have rejected the proposition that "at a meaningful time and in a meaningful manner" *always* requires the State to provide a hearing prior to the initial deprivation of property. This rejection is based in part on the impracticability in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available.

In *Brucar* a judgment debtor was jailed for failure to post the appeal bond initially required by the trial court, despite the fact that he was in the process of seeking alteration of the bond from the reviewing court. *Brucar,* 638 F.2d at 990–91 (footnote omitted) said:

> It might well be desirable to decree that trial courts may not jail appellants for failure to post an appeal bond at a time when the appellants are in the process of asking a higher court to reduce the amount of the bond, but that would be a matter of policy for the Illinois legislature to decide.

It follows then that the prospect of a litigant remaining at risk pending the Appellate Court's determination in a post-"deprivation" hearing (that is, while the appellant suffers the possibility of execution of the unstayed money judgment) does not implicate a Fourteenth Amendment violation.

---

1. *Brucar,* 638 F.2d at 990 held that Rule 305(f) cannot be construed to provide for an automatic stay of the trial court's appeal bond order—a ruling that certainly creates the prospect that in some cases the hearing by the Appellate Court will come after the initial deprivation.